NORTHWEST FOREST WORKERS
ASSOCIATION, et al., Plaintiffs,

Walso Wint, et al., Intervenors,

v.

Richard E. LYNG, et al., Defendants.

Augustin VALDEZ VALENCIA, et
al., Plaintiffs,

v.

Richard E. LYNG, et al., Defendants.

Civ. A. Nos. 87–1487, 87–3303.

United States District Court,
District of Columbia.

April 25, 1988.

**2**

Barnaby W. Zall, Washington, D.C., for plaintiffs.

Wilma A. Lewis, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

THOMAS F. HOGAN, District Judge.

In Civil Action No. 87–1487, plaintiffs brought suit principally under the Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, 100 Stat. 3359 (Nov. 6, 1986) (adding section 210 of to the Immigration and Nationality Act, 8 U.S.C. § 1160) ("IRCA" or the "Act") alleging that the Secretary of Agriculture (the "Secretary") promulgated definitional regulations that are beyond the scope of the Secretary's

statutory authority. The Court permitted intervenors to enter the action. Intervenors allege that the Secretary promulgated definitional regulations that are so narrowly drawn as to be arbitrary and capricious. Presently before the Court are the parties' cross-motions for summary judgment in Civil Action No. 87–1487. For the reasons stated in this opinion, the Court shall deny plaintiffs' motion and grant intervenors' motion in part.

## FACTS

The IRCA created the Seasonal Agricultural Worker ("SAW") program which extends lawful immigrant status to aliens who qualify for the SAW program. An individual must apply in the 18 month period beginning June 1, 1987 and demonstrate that he is otherwise admissible into the United States as an immigrant. 8 U.S.C. § 1160(a). Furthermore, the applicant must show that he resided in the United States and performed seasonal agricultural services ("SA services") for at least 90 days between May 1, 1985 and May 1, 1986. *Id.* SA services constitute "the performance of field work related to planting, cultural practices, cultivating, growing and harvesting of fruits and vegetables of every kind and other perishable commodities, as defined in regulations by the Secretary of Agriculture." 8 U.S.C. § 1160(h). Achievement of SAW status confers the status of an alien lawfully admitted for temporary residence. 8 U.S.C. § 1160(a). Thereafter, the individual may seek and receive the status of an alien lawfully admitted for permanent residence. *Id.*[1]

Pursuant to the statutory authority to promulgate definitional regulations, the Secretary appointed Allison T. French to a temporary position of Acting Special Assistant for Labor Affairs to the Assistant

---

1. The IRCA also amended the existing foreign guest worker program, the H–2 program, which is presently referred to in its amended form as the H–2A program. 8 U.S.C. § 1186. Under the H–2A program an agricultural employer may petition the Secretary of Labor for a certification that there are insufficient domestic workers available and willing to perform and that the employment of alien labor will not adversely affect the wages and working conditions of workers in the United States similarly employed. In considering whether there are sufficient domestic workers, the Secretary of Labor shall include SAW workers within the ranks of domestic workers. The Secretary of Labor cannot require employers to apply for foreign workers under the H–2A program more than 60 days in advance of need. 8 U.S.C. § 1186(c)(1).

Secretary for Economics in the United States Department of Agriculture to oversee the rulemaking. The agency issued the notice of the proposed definitions. 52 Fed. Reg. 13246 (April 22, 1987). Following an informal rulemaking overseen by Mr. French, the agency promulgated the definitions. 52 Fed.Reg. 20372 (June 1, 1987). The Secretary defined various components of SA services. Those definitions which are pertinent to the case presently before the Court include the following:

> *Critical and unpredictable labor demands*—"the period during which field work is to be initiated cannot be predicted with any certainty 60 days in advance of need." 52 Fed.Reg. at 20376.

> *Agricultural lands*—"any land, cave or structure, except packinghouses or canneries, used for the purpose of performing field work." *Id.*

> *Field work*—"any employment performed on agricultural lands for the purpose of planting, cultural practices, cultivating, growing, harvesting, drying, processing, or packing any fruits, vegetables or other perishable commodities. These activities have to be performed on agricultural land in order to produce fruits, vegetables, and other perishable commodities, as opposed to those activities that occur in a processing plant or packinghouse not on agricultural lands. Thus, the drying, processing, or packing of fruits, vegetables, and other perishable commodities in the field and the "on the field" loading of transportation vehicles are included. Operations using a machine, such as a picker or a tractor, to perform these activities on agricultural land are included. Supervising any of these activities shall be considered per-

forming the activities." *Id.*

> *Fruits*—"the human edible parts of plants which consist of the mature ovaries and fused other parts or structures, which develop from flowers or inflorescence." *Id.*

> *Other perishable commodities*—"those commodities which do not meet the definition of fruits or vegetables, that are produced as a result of seasonal field work, and have critical and unpredictable labor demands. This is limited to Christmas trees, cut flowers, herbs, hops, horticultural specialties, spanish reeds (arundo donax), spices, sugar beets, and tobacco. This is an exclusive list, and anything not listed is excluded. Examples of commodities that are not included as perishable commodities are animal aquacultural products, birds, cotton, dairy products, earthworms, fish including oysters and shellfish, forest products, fur bearing animals and rabbits, hay and other forage, and silage, honey, horses and other equines, livestock of all kinds including animal specialties, poultry and poultry products, sod, sugar cane, wildlife, and wool." *Id.*

> *Vegetables*—"the human edible leaves, stems, roots, or tubers of herbaceous plants." *Id.*

Plaintiffs, who represent American forestry interests and individual American tobacco workers, brought suit alleging that the Secretary promulgated overly broad regulations.[2] Plaintiffs claim that the definitions of components of SA services expand the scope of the IRCA beyond what

---

**2.** Plaintiffs include the Northwest Forest Workers Association ("NWFWA"), a nonprofit association of worker-owned forestry labor cooperatives in the United States Pacific Northwest; Second Growth, Inc., a worker-owned forestry and construction firm; the Federation for American Immigration Reform ("FAIR"), a nonprofit organization concerned with the economic, environmental and demographic effects of immigration; individual plaintiffs Jack Viscardi and Ted Drummond, who, respectively, are the president and part owner of Second Growth; and individual plaintiffs John E. Simmons, Jimmie Wiggins and Lewis W. Smith each of whom are United States citizens engaged as agricultural workers in the tobacco industry.

Defendants contest plaintiffs' standing to bring this suit. The issue of standing need not extensively detain the Court. The Court notes that the individual and organizational plaintiffs satisfy the standing requirements as defined by the United States Supreme Court. *See Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982); *James B. Hunt, Jr. v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *see also Humane Society v. Hodel,* 840 F.2d 45, 45–61 (D.C.Cir.1988).

Congress intended the SAW program to cover. Specifically, plaintiffs contest the Secretary's definition of "other perishable commodities" maintaining that "perishability" means that the crop will spoil on the plant if not picked immediately and that the crop is traditionally associated with labor-intensive field work. Moreover, plaintiffs dispute the Secretary's definitions of fruits and vegetables. In particular, plaintiffs contend that perishability was meant to apply to *all* plant crops, e.g., fruits, vegetables, and other commodities. As such, plaintiffs maintain that the Secretary, by defining fruits, vegetables, and other perishable commodities in the terms set forth above, included in the SAW program crops that Congress never intended be incorporated in the program. Finally, plaintiffs contend that Congress intended "field work" to be limited to traditional cultivating and harvesting activities not drying, canning, and other means of processing.

Intervenors, who represent alien sugar cane workers, contend that the Secretary's regulations are too restrictive.[3] Initially, intervenors contend that the Secretary's definition of vegetables is arbitrary and capricious. Alternatively, intervenors argue that sugar cane falls within the Secretary's definition of vegetables and should be included in the SAW program. Furthermore, intervenors maintain that by defining "other perishable commodities" in terms of "critical and unpredictable labor demands" the Secretary acted arbitrarily and capriciously. Alternatively, even if the definition is lawful, intervenors contend that sugar cane falls within "other perishable commodities" as defined and that the Secretary arbitrarily and capriciously excluded it.

## SCOPE OF REVIEW

The United States Supreme Court has provided guidance on the manner in which a court determines whether an agency's regulations are consistent with statutory mandate. *See Chevron, U.S.A., Inc., v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). First, a court determines whether Congress has spoken directly on the issue. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* If, however, the court determines that Congress has not directly spoken of the question at issue "the court does not simply impose its own construction on the statute ... [r]ather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782; *see Mead Johnson Pharmaceutical Group v. Bowen,* 838 F.2d 1332, 1335–36 (D.C.Cir.1988) (court questions whether the agency's construction of the statute is rational and consistent with the statute). "It is principally where Congressional intent is not clear from the statutory text and the legislative history that a reviewing court gives substantial deference to 'reasonable' agency constructions." *Catholic Social Services, Inc. v. Meese,* 664 F.Supp. 1378, 1383 (E.D.Cal.1987) (interpreting § 1160(d) of the IRCA) (citing *I.N. S. v. Cardoza–Fonseca,* 480 U.S. 421, 107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434 (1987)). In determining whether the agency's interpretation is reasonable, the Court must confine its inquiry to statements and materials before the agency in the course of its rulemaking. *AFL–CIO v. Brock,* 835 F.2d 912, 918 (D.C.Cir.1987) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983)).

---

**3.** Intervenors include various individuals, Walso Wint, Delroy Anderson, Martin Fonseca, Eugene Paul, and Delroy Brown, who worked in sugar cane for more than 90 days and would ostensibly be eligible for SAW status if sugar cane were incorporated into the SAW program; the Migration and Refugee Services of the Diocese of Palm Beach, a nonprofit corporation which provides counseling to aliens seeking SAW status and assistance in processing their applications; and the Haitian Refugee Center, a nonprofit membership organization among whose members are alien sugar cane workers who potentially would be eligible for SAW status.

## I. THE SECRETARY'S DEFINITION OF OTHER PERISHABLE COMMODITIES IS REASONABLE AND IS NOT ARBITRARY AND CAPRICIOUS.

 Both plaintiffs and intervenors take issue with the Secretary's definition of other perishable commodities in terms of critical and unpredictable labor demands. Intervenors claim the criterion puts a restrictive gloss on what Congress intended other perishable commodities to mean. Plaintiffs contend that the criterion unlawfully expands those crops which Congress intended be included within the scope of other perishable commodities. The Secretary maintains that the definition of perishable commodities in terms of critical and unpredictable labor demands is reasonable and comports with the legislative history of the IRCA.

The agency's notice of the proposed rulemaking and notice of the final rules shed some light on the rationale for defining other perishable commodities in terms of critical and unpredictable labor demands. The notice of proposed rulemaking explained that the critical and unpredictable labor demands criterion addresses the instances in which growers employ alien workers to harvest perishable commodities. Specifically, the criterion

is predicated upon unpredictable circumstances and the more immediate needs for labor which result from those circumstances. Typical of the circumstance which creates the critical, yet unpredictable demand for labor is weather or other climate conditions. As a result, a labor force would be needed on short notice.

52 Fed.Reg. at 13247. In the final regulation, the Secretary did not repudiate the language concerning weather. *See* 52 Fed. Reg. at 20373.[4] Additionally, the Secretary addressed a concern similar to plaintiffs' claim that rather than defining perishability in terms of critical and unpredictable labor needs, the Secretary should define perishability in terms of the potential for

deterioration if not harvested immediately at maturity. The Secretary stated that the agency rejected such a definition as "too vague" since "anything organic deteriorates." 52 Fed.Reg. at 20373.

This rationale is supported by Mr. French's statements submitted in the course of this litigation which explained the agency's deliberations concerning the manner of defining other perishable commodities. Declaration of Allison T. French, Special Assistant for Labor Affairs to the Assistant Secretary for Economics, United States Department of Agriculture, September 4, 1987 (French Decl. I) ¶ 9; Second Supplemental Declaration of Allison T. French, December, 1987 (French Decl. II) ¶ 2. The agency discarded suggestions of defining perishability in terms of labor intensity, the degree of dependence on illegal aliens, the rate of deterioration and the impact of weather conditions due to the "difficulties in measuring some criteria and the overinclusiveness of other criteria." French Decl. I ¶ 9. The agency chose critical and unpredictable labor demands as consistent with the legislative history and the more precise and manageable criteria. French Decl. I ¶ 9; French Decl. II ¶ 2.

Because the meaning of other perishable goods is not apparent from the face of the statute, it is appropriate to consider the IRCA's legislative history. While committee reports "cannot serve as an *independent statutory source having the force of law*," they "may ordinarily be used to interpret unclear language contained in a statute." *International Brotherhood of Electrical Workers, Local Union No. 474, AFL–CIO v. National Labor Relations Board*, 814 F.2d 697, 712 (D.C.Cir.1987) (emphasis in original). In this context, the House Judiciary Committee Report is especially illuminating because this congressional committee formulated and fully explained the SAW language that ultimately was enacted into law. *See* H.Rep. No. 682, Part I, 99th Cong., 2d Sess. (1986), U.S.

---

**4.** The Secretary merely noted in the regulation's final promulgation that "the critical and unpredictable nature of seasonal agricultural services means that it is not possible to make a determination of labor needs 60 days in advance of those needs and the time of the labor needs cannot be forecast with reasonable certainty." 52 Fed.Reg. at 21373.

Code Cong. & Admin.News 1986, 5649. The report stated that "[a]gricultural interests, particularly western growers of perishable agricultural commodities (basically, fresh fruits and vegetables) have come to rely heavily on the existence of an undocumented work force." *Id.* at 83, U.S.Code Cong. & Admin.News 1986, at 5687. The report indicates that while Congress desired to address growers' interests, Congress also desired protection of workers from abuses associated with the Bracero program of the 1940's and 1950's. *Id.* at 83–85. Accordingly, Congress enacted the SAW program to assure that workers were "admitted not as nonimmigrants (i.e., not as guest workers) but as lawful permanent resident aliens of the United States." *Id.* 84–85, U.S.Code Cong. & Admin.News 1986, 5688–5689. Ultimately, the legislative history indicates a dual purpose for the IRCA—assuring growers of a supply of laborers *and* assuring protection of those laborers from employer abuse.

The Secretary cites congressional statements which indicate that defining perishability in terms of critical and unpredictable labor needs was reasonable and within the legislative history. *See* Defendants' Motion I, Attachment A (quoting congressmen's statements that demonstrate that congressional intent was that perishability be defined in terms of critical and unpredictable labor demands). Senator DeConcini's statement concerning the nature of perishable commodities is representative of various congressional statements concerning the critical and unpredictable labor needs of perishable commodities.

The perishable crop industry differs from the rest of the agricultural industry in two important ways ... First, it is impossible for growers of perishable crops to predict more than a few days in advance when their need for workers will occur. Second, their need for workers is short and it is very intense.

131 Cong.Rec. S11330 (Sept. 12, 1985) (statement of Sen. Deconcini).[5] Although the Senate version, which conferred immigrant status on SAW workers, and the House version, which ultimately became the IRCA and conferred nonimmigrant status on SAW workers, differed, both the House and the Senate recognized that one of the underlying problems which Congress was seeking to address was the perishable commodities industry's reliance on an alien work force for those crops necessitating immediate harvesting on short notice.

The Secretary utilized a 60–day bright line cut off for defining critical and unpredictable labor demands because the time frame represents the minimum advance time that the Department of Labor can require a grower to petition for temporary agricultural workers under the H–2A program. French Decl. I ¶ 10; French Decl. II ¶ 2. If an employer can foresee his labor needs in advance of 60 days, he utilizes workers under the H–2A program. If he cannot forecast his labor needs in 60 days or less, he turns to the SAW program. This interface between the SAW program and the H–2A program is supported by the legislative history. *See* H.Rep. 682, Pt. I, *supra,* 51.[6] The legislative history also

---

5. Intervenors' attempts to discredit Sen. DeConcini's statement, as well as a number of statements by various congressmen, by claiming that they are irrelevant because they were made in the context of the Wilson amendment which was the unenacted Senate version of the SAW program fall short. While the Court is wary of relying on often self-serving statements made by congressmen in the course of congressional debates, the Court in the course of statutory interpretation may look to the entire legislative history of a statute. *See Population Institute v. McPherson,* 797 F.2d 1062, 1069 (D.C.Cir.1986) ("[T]he key to legislative history is that while many elements represent pieces in the puzzle, no one piece—no matter how clear and unequivocal—is alone dispositive.")

6. Plaintiffs attempt to argue, essentially, that the SAW program was intended to benefit exclusively Western growers. Plaintiffs cite language from reports out of context. The legislative history simply does not support such a narrow interpretation of the SAW program. While Congress was concerned with assuring an adequate work force for Western growers, Congress did not limit the SAW program to cover only those growers. Rather, Congress enacted a nationwide program covering certain agricultural activities in connection with "fruits and vegetables of *every* kind and other perishable commodities." 8 U.S.C. § 1160(h) (emphasis added). Furthermore, the very length of time necessary for passage of the IRCA and its history reflect the myriad of compromises between various

indicates that the SAW program was intended to be a supplement to the H–2A program.

> Regarding perishable commodities, the Committee recognizes that special situations exist that may render the H–2 program less than fully responsive to Western grower needs. Accordingly, the Committee bill establishes a mechanism by which "special agricultural workers" may be admitted to perform field work in perishable crops.

*See id.* at 50–51; *see also* Defendants' Motion to Dismiss or in the Alternative for Partial Summary Judgment (Defendants' Motion I) Attachment B (listing various congressional statements indicating the interrelationship of the SAW and H–2A programs). This dividing line between the H–2A program and the SAW program drawn by the 60–day bright line rule was reasonable.[7]

Congress, rather than defining perishable commodities itself, directed the Secretary to do so. 8 U.S.C. § 1160(h). "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulations. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82. In light of the legislative history, the Court finds that the Secretary's definition of other perishable commodities in terms of critical and unpredictable labor demands is reasonable and not arbitrary and capricious.

## II. THE SECRETARY ARBITRARILY AND CAPRICIOUSLY INCORPORATED THE "HERBACEOUS" REQUIREMENT IN DEFINING VEGETABLES.

At the outset, the Court notes that "judges review administrative action on the basis of the agency's *stated* rationale and findings." *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Commission,* 751 F.2d 1287, 1325 (D.C.Cir.1984), *cert. denied,* 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986) (emphasis in the original). The agency must "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 48, 103 S.Ct. 2856, 2869, 77 L.Ed.2d 443 (1983); *see Federal Election Commission v. Rose,* 806 F.2d 1081, 1088 (D.C.Cir.1986) ("agency action accompanied by an inadequate explanation constitutes arbitrary and capricious conduct"). The Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). In attempting to discern the rationale of an agency that fails to explain fully an administrative act such that judicial review is frustrated, the Court may rely on affidavits from agency decisionmakers. *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The Court, however, must ignore

interest groups which the statute represents. *See* H.Rep. 682, Pt. I, *supra,* 51–56 (detailing the lengthy congressional maneuvering necessary to secure reform of immigration policy). Finally, the legislative history, while demonstrating a concern with the problems of growers, indicates that the IRCA is not a one-sided statute. Specifically, the legislative history indicates a concern for the growers as well as a concern that the SAW workers "be fully protected under all federal, state and local labor laws." *Id.* at 51, U.S.Code Cong. & Admin.News 1986, at 5655. The Court cannot accept plaintiffs' assertions that the IRCA is a statute oriented solely to assist Western growers.

**7.** While plaintiffs do not appear to dispute the interrelationship of the H–2A program and the

SAW program, they seem to suggest that the more appropriate outer limit would be a 72–hour bright line rule. Plaintiffs' Motion for Summary Judgment at 19, 27, 33–34. Plaintiffs do not demonstrate that the legislative history requires a 72–hour time limit in the context of perishability. As discussed in the text, the Secretary's choice of a 60–day limit is reasonable and supported by the legislative history. Even if plaintiffs' alternative is *rational,* in light of the Secretary's demonstration that the 60–day rule is a logical interpretation of the IRCA's legislative history, the Court will not assume the role of decisionmaker between two reasonable alternatives and will defer to the agency.

**8**

"[p]ost hoc rationalizations advanced to remedy inadequacies in the agency's record or its explanation [which] are bootless." *City of Brookings Municipal Telephone Co. v. Federal Communications Commission*, 822 F.2d 1153, 1165 (D.C.Cir.1987).

Initially, intervenors dispute the inclusion of the herbaceous limiting factor on the broad botanical definition of vegetables. In his final rulemaking, the Secretary stated that "[t]he unambiguous language of the statute requires the inclusion of 'fruits and vegetables of every kind', meaning fruits and vegetables without exception." 52 Fed.Reg. at 20375. In the proposed rulemaking, the Secretary noted that this language left him little discretion in identifying fruits and vegetables. 52 Fed.Reg. at 13247. As such, the Secretary announced he planned to adopt a broad, botanical definition of vegetables because of its "clear scientific basis." *Id.* The Secretary quoted a botany textbook which stated that

> [f]rom a botanical standpoint . . . fruits . . . may be distinguished from vegetables if the definition of fruits is kept in mind. A fruit always develops from a flower and is always composed of at least one ripened and mature ovary with which may be fused other parts of structures associated with the flower. Any edible part of the plant that does not conform to this definition of a fruit should be classified a vegetable.

52 Fed.Reg. at 13247.

■ In contradiction to the agency's statements enunciating its intention to utilize a broad botanical definition of vegeta-bles, the agency ultimately applied two limiting factors. French Decl. II ¶ 5. Specifically, the agency utilized the limiting factor of "human edible" which the agency explained adequately and extensively in the notice of proposed rulemaking. 52 Fed. Reg. at 13247; *see* French Decl. I ¶ 11; French Decl. II ¶ 5.[8] The Secretary, however, did not discuss at any time the second limiting factor of "herbaceous." The first instance of the agency's attempt to explain the herbaceous requirement appears in the context of this litigation. French Decl. II ¶ 5. While the agency contends the herbaceous requirement was incorporated to "reflect Congress' intent not to include 'woody' or nonherbaceous commodities such as forest products within the scope of the SAW program", *id.*, the agency fails to direct the Court's attention to any legislative history in support of such a contention. In fact, a number of fruit trees, which are woody, are included within the SAW program because they bear fruit. Finally, the clear statutory language requires the inclusion in the SAW program of "fruits and vegetables of every kind," 8 U.S.C. § 1160(h), which the Secretary stated at the time of the promulgation of the regulation meant "fruits and vegetables *without exception.*" 52 Fed.Reg. at 20375 (emphasis added). The agency's attempt, at this stage, to justify the limitation on the definition of vegetable is directly at odds with the Secretary's statements, made contemporaneous with the promulgation of the regulations, concerning the statutory limitation on the discretion of the Secretary in defining vegetables.[9] As such, the Court

---

8. The Secretary adequately explained the inclusion of humanly edible in the following terms

> While the botany literature in defining fruits and vegetables makes reference to their being edible, it is clear from the context in which these definitions are discussed that the reference is to consumption of the fruit or vegetable by humans. Thus, "human edible", has been made an explicit part of the botanical definitions of fruits and vegetables in this proposed rule.
> The requirement in the proposed rule that the fruits or vegetables be human edible comports with congressional intent, especially given the distinction drawn by Congress between fruits and vegetables as opposed to other per-

ishable commodities. While the broad botanical definitions in this proposed rule include virtually all fruits and vegetables, it is estimated that few additional alien workers will be eligible to be admitted as [SAW's] as a result. "Other perishable commodities" is essentially a listing of those commodities that are not fruits or vegetables; but are produced as a result of seasonal field work, and have critical and unpredictable labor demands.
> 52 Fed.Reg. at 13247.

9. In fact, the agency's first attempt to explain the herbaceous requirement occurred in December, 1987, well into the course of this litigation and after the parties already had briefed the issues extensively. Furthermore, intervenors

finds that the agency acted arbitrarily and capriciously by failing to adequately explain its incorporation of "herbaceous" in the definition of vegetables.

■ Furthermore, the Court notes that plaintiffs have failed to substantiate their assertions that perishability should apply to fruits and vegetables as well as other commodities. The Secretary interpreted "fruits and vegetables of every kind and other perishable commodities" to mean all fruits and vegetables were to be within the scope of the SAW program and only other commodities which are perishable were to be incorporated into the SAW program. Plaintiffs contend that perishability should apply to fruits and vegetables such that only fresh fruits and vegetables and fruits and vegetables which are picked fresh and then field-dried are included in the SAW program. Furthermore, plaintiffs maintain that the Secretary should have defined fruits and vegetables by their "common" meaning rather than a "scientific" meaning.

■ Congress granted the Secretary broad authority to promulgate definitions of fruits and vegetables. Congress never indicated that an everyday definition of fruits and vegetables was to be used over a scientific definition. Furthermore, the Court notes that plaintiffs fail to demonstrate that a "common" definition exists. The Court will defer to the agency's expertise and its reasonable definition of fruits and vegetables in scientific terms. *See I.N.S. v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434 (discussing principle of judicial deference to an administrative agency) (citing *Chevron*, 467 U.S. at 842–45, 104 S.Ct. at 2781–83).

As to the issue of applying perishability to fruits and vegetables, the Court notes that the House version, which ultimately was enacted, altered the Senate version's scope of the SAW program from "services in agriculture employment . . . involving perishable commodities," 131 Cong.Rec. S11320, to "fruits and vegetables of every kind and other perishable commodities." 8 U.S.C. § 1160(h). The Secretary's interpretation of the amended language as representing a conscious congressional decision to separate out fruits and vegetables of every kind from other commodities which are perishable is eminently reasonable and the Court cannot overturn such an interpretation.

## III. THE SECRETARY ARBITRARILY AND CAPRICIOUSLY EXCLUDED SUGAR CANE FROM THE SCOPE OF OTHER PERISHABLE COMMODITIES.

■ Although the Secretary did not include sugar cane within the definition of vegetables,[10] the Secretary refused to incorporate sugar cane within the definition of perishable commodities. The regulation provides an exclusive list of nine crops which constitute perishable commodities.[11] In the notice of the final regulation, the agency prepared a relatively lengthy explanation of the reason for excluding sugar cane from the list of perishable commodities. 52 Fed.Reg. at 20375. The agency noted that "sugar cane does not have the critical and unpredictable labor demand

point out that sugar cane appears to be the only plant crop grown for human consumption in the United States which is excluded from the Secretary's definition of fruits, vegetables and other perishable commodities based on the herbaceous requirement. Intervenors' Motion for Summary Judgment at 21 n. 7. Defendants do not meaningfully rebut this assertion. In light of this fact and the lateness with which the agency attempts to explain the herbaceous requirement, the Court believes that agency is engaging in *post hoc* rationalizations.

10. The only reference made to sugar cane as a fruit or vegetable came in the final promulgation of the regulation and stated that "[s]ugar cane is a perennial grass, not a fruit or vegetable." 52 Fed.Reg. at 20375. In light of the Court's determination that the Secretary arbitrarily and capriciously defined vegetables, the Court will not address the issue of whether sugar cane falls within the scope of vegetables. On remand, the Secretary will have to adequately explain his definition of vegetables. At that time, the Secretary may have to reevaluate whether sugar cane is a vegetable.

11. Included within the scope of other perishable commodities are Christmas trees, cut flowers, herbs, hops, horticultural specialties, Spanish reeds, spices, sugar beets, and tobacco.

concerning its production as do fruits and vegetables, and other perishable commodities." *Id.* Apparently, the agency arrived at this conclusion based on a finding that

> [s]ugar cane ... is normally harvested between one to two years of growth. It is mature during most of this period. The timing of the harvest is not critical, but is scheduled over a period of several months for the efficient operation of the processing mill.... Harvest dates are quite predictable and may be scheduled several months in advance.... Since the timing of the harvest of sugar cane is completely under the control of the farmer, and sugar cane would not perish if not cut down, we find that it does not meet the criteria of being subject to critical and unpredictable labor demands. Thus, sugar cane has not been included as a perishable commodity.

*Id.*

The Secretary went on to address the fact that a number of commentators cited two court opinions which indicated that sugar cane is a perishable commodity. *See Maneja v. Waialua Agricultural Company*, 349 U.S. 254, 75 S.Ct. at 719, 99 L.Ed. 1040 (1955); *Wirtz v. Osceola Farms Company*, 372 F.2d 584 (5th Cir.1967). The agency stated that the cases were inapposite because they were in the context of a different statute and addressed sugar cane's perishability *after* harvesting. 52 Fed.Reg. at 20375. The Secretary contended that Congress intended the "perishability of commodities ... to be considered up to the point of harvesting." *Id.*

Finally, the agency addressed commentators' suggestions that the legislative history of the IRCA specifically required the exclusion of sugar cane. These comments referred to a statement by Senator Wilson in which the Senator said

> The fact of the matter is that these [perishable] crops are ripe for harvest when climatic conditions allow them to be, not when the Secretary of Labor certifies them to be. Perhaps that is why the Department processes less than 20,000 H-2 workers each year, many of them to cut sugarcane which is hardly considered a highly perishable crop.

131 Cong.Rec. S11323 (Sept. 12, 1985) (statement of Sen. Wilson). The Secretary stated that this pronouncement amounts to an affirmation that sugar cane is not perishable.[12]

While the parties have submitted numerous affidavits and declarations concerning whether or not sugar cane falls within the definition of perishable commodities, as previously noted, the Court's review of an informal rulemaking is limited to the administrative record as it appeared before the agency at the time of the regulation's promulgation. The Court has conducted an exhaustive review of the contents of the administrative record. The agency record contains a number of comments regarding the categorization of sugar cane.[13] It ap-

---

12. Intervenors contend that Senator Wilson's statement could be read to mean that while sugar cane is not *highly* perishable, it might be "regularly" perishable. The Court will not decide between two equally reasonable interpretations.

13. *See* Ad.Rec.Doc. No. 342 (Texas Farmers Union argues that sugar cane, among others, is a perishable commodity); Ad.Rec.Doc. No. 346 (American Farm Bureau Federation statement supporting the exclusion of sugar cane from the definition of perishable commodities despite an earlier suggestion that sugar cane was perishable due to the large numbers of seasonal workers used in sugar cane harvesting); Ad.Rec.Doc. No. 412 (Diocese of Orlando opposes exclusion of sugar cane from perishable commodities); Ad.Rec.Doc. No. 483 (Association of Farmworker Opportunity Programs states that sugar cane has long been thought of as perishable in the context of the H-2 program; alternatively, sugar cane could be viewed as the "human edible stem of ... plants"); Ad.Rec.Doc. No. 485 (Congressional Black Caucus urges that sugar cane be considered perishable in light of the necessity to harvest and process sugar cane at maturity to avoid loss of sucrose content and of the affects of adverse weather upon sugar cane harvesting); Ad.Rec.Doc. No. 560 (group of individuals urge that empirical research suggests that sugar cane is a perishable commodity); Ad.Rec.Doc. No. 561 (People's Law Office for Organized Workers urges the inclusion of sugar cane as a perishable commodity); Ad.Rec.Doc. No. 562 (Farmworker Association of Central Florida urges the inclusion of sugar cane as a perishable commodity); Ad.Rec.Doc. No. 597 (Federation for American Immigration Reform agrees with agency that sugar cane should be excluded for

pears that despite the extensive written record devoted to the categorization of sugar cane, Mr. French relied on a telephone conversation with Mr. Luigi Angelo, a sugar cane specialist and cost accountant with the Economic Research Service at the United States Department of Agriculture. French Decl. I ¶ 13; French Decl. II ¶ 4. Mr. Angelo reported that the timing of the sugar cane harvest is scheduled over several months and that the timing of the harvest is under the control of the farmer. French Decl. I ¶ 13. Furthermore, Mr. Angelo indicated that "on occasion, sugar cane which was not harvested during the current year, had been carried over to be harvested the following year." *Id.* Based on this conversation and his own personal knowledge regarding the harvesting and labor practices in the sugar cane industry, Mr. French concluded that sugar cane was outside the scope of perishable commodities. French Decl. II ¶ 3.[14] According to Mr. French, the agency rejected the impact of weather conditions on crops because of the difficulty in measuring the impact or the overinclusive nature of such a criterion. French Decl. I ¶ 9. This statement however does not comport with agency statements made in the course of the rulemaking. Specifically, the explanation accompanying the proposed rule stated that "[t]ypical of the circumstance which creates the critical, yet unpredictable demand for labor is weather or other climate conditions. As a result, a labor force would be needed on short notice." 52 Fed.Reg. at 13247. The agency did not refute this language in the final rule. Rather the agency stated that it

had "revised [the definition] to clarify that the critical and unpredictable nature of seasonal agricultural services means that it is not possible to make a determination of labor needs 60 days in advance of those needs and the time of the labor needs cannot be forecast with reasonable certainty." *Id.* at 20373.[15]

Furthermore, Mr. French's statement concerning the discarding of consideration of weather conditions does not comport with the agency's explanation for the inclusion of horticultural specialties (nursery products) within the definition of other perishable commodities. In the final promulgation of the regulation, the agency explained that the activities associated with horticultural specialties were "highly subject to unpredictable weather influences." *Id.* at 20374. The Court finds that these conflicting statements are strong indications that the agency is attempting to backtrack and engage in *post hoc* rationalizations. Furthermore, despite the fact that, out of a total of the eleven comments addressing sugar cane, only two comments supported, in conclusory language, the exclusion of sugar cane from other perishable commodities, Ad.Rec.Doc. Nos. 346, 597, Mr. French relied solely on his own knowledge and one telephone call, which never appeared in the administrative record, to determine that sugar cane was not another perishable commodity. These two circumstances convince the Court that the Secretary acted arbitrarily and capriciously in excluding sugar cane from the scope of perishable commodities.

the SAW program); Ad.Rec.Doc. No. 614 (Migrant Legal Action Program states that sugar cane traditionally is considered a perishable commodity); Ad.Rec.Doc. No. 615 (Farmworker Justice Fund provides extensive documentation in support of sugar cane's inclusion as a perishable commodity or a vegetable). Of the above comments only two supported, in a conclusory manner, the proposed exclusion. Ad.Rec.Doc. Nos. 346, 597.

**14.** Prior to beginning work as a Special Assistant on January 12, 1987, Mr. French had managed his family's citrus operation in Florida from 1957 to 1964. From 1966 to 1972, Mr. French worked as a consultant in labor relations with Management Research Institute

(MRI) of West Palm Beach until he was transferred to Orlando where he continued employment with MRI until 1977. From 1977 to 1985 Mr. French was employed as Director of Labor Relations, and later Director of Public Affairs by the Florida Farm Bureau. French Decl. ¶ 2.

**15.** The proposed rule stated that critical and unpredictable labor demands meant "that a 60 day period during which field work is to be initiated cannot be predicted with any certainty." 52 Fed.Reg. at 13248. The final regulation defined the term as meaning that "the period during which field work is to be initiated cannot be predicted with any certainty 60 days in advance of need." *Id.* at 20376. Basically, the definitions are not different.

## IV. THE SECRETARY'S DEFINITION OF "FIELD WORK" IS NOT ARBITRARY AND CAPRICIOUS.

■ Plaintiffs allege that the definition of field work is overly broad.[16] The House Judiciary Committee stated that

"Seasonal agricultural services" ... cover field work performed with respect to fruits, vegetables, and other perishable commodities, including perishable horticultural commodities, such as flowers, as well as fruits and vegetables (such as raisins and prunes) which, although picked fresh, are later dried or otherwise processed before consumption. The term does not cover work in packing houses or canneries or the transportation of farm produce other than that normally involved in field work, nor does it include crops that are not traditionally associated with labor-intensive field operations.

H.Rep. No. 682, Pt. 1, *supra*, at 85. The agency claims that it defined field work in keeping with the Congress' intent.

In explaining the rationale for its definition of field work, the agency addressed a number of commentators who noted the irrationality of a distinction between workers engaged in "on farm" packing and workers performing the identical activities at some other location. Furthermore, the Secretary was concerned with comments that a definition distinguishing between identical activities merely based on performance "on farm" rather than "off farm" would cause the separation of families merely "because they had worked across the road from one another." 52 Fed.Reg. at 20373. In consideration of these concerns, the agency stated that

The legislative history suggests that Congress did not intend to include packinghouses or canneries within field work; at the same time, Congress did recognize that processing activities associated with field work would be covered. In light of these comments, we think that the most reasonable way of achieving congressional intent and harmonizing the tension between these concepts is to look at a normal farming operation as an integrated whole. We have sought to clarify this definition by adding a definition of "agricultural lands" and clarifying language to the definition of "field work".

*Id.*

The administrative record contains a number of documents concerning the definitions of field work and agricultural lands.[17] These comments more than suffi-

---

16. Field work is defined as

any employment performed on agricultural lands for the purpose of planting, cultural practices, cultivating, growing, harvesting, drying, processing, or packing any fruits, vegetables or other perishable commodities. These activities have to be performed on agricultural land *in order to produce fruits vegetables* and other perishable commodities, as opposed to those activities that occur in a processing plant or packinghouse not on agricultural lands. Thus, the drying, processing, or packing of fruits, vegetables, and other perishable commodities in the filed and the "on the field" loading of transportation vehicles are included. Operations using a machine, such as a picker or a tractor, to perform these activities on agricultural land are included. Supervising any of these activities shall be considered performing the activities.

52 Fed.Reg. at 20376. Agricultural lands are "any land, cave of structure, except packinghouses or canneries, used for the purpose of performing field work." *Id.*

17. *See* Ad.Rec.Doc. No. 172 (letter from A. Duda & Sons, Inc. stating that need for clarification of field work was necessary to avoid penalizing "agricultural employers who have constructed shed operation mainly to improve working conditions ... the type of work done [in the sheds] ... is identical to work done be a harvest crew in the field"); Ad.Rec.Doc. No. 311 (letter from the Oregon Farm Bureau stating that "packaging and processing are necessary steps in agricultural production ... [and] most processing plants and packing sheds are separated from field operations" which might unfairly exclude a number of seasonal workers); Ad.Rec.Doc. No. 445 (letter from Proteus stating that "packing is packing, whether it is done at a field site or two miles down the road"); Ad.Rec.Doc. No. 471 (comments from the Idaho Grower Shippers Association stating that the same protection should extend to "those who are doing the same kind of work outside the actual production field"); Ad.Rec.Doc. No. 478 (Western Growers Association urging inclusion of packinghouse activities with the scope of field work); Ad.Rec. Doc. No. 480 (comments of Rural Opportunities, Inc. that a worker could be penalized for a change in the location from outdoors to indoors if field work is not adequately defined); Ad.Rec. Doc. No. 483 (comments of the Association of *Farmworker Opportunity Programs* urging that

ciently support approaching field work by looking at the normal farming operation as an "integrated whole." *See, e.g.*, Ad.Rec. Doc. Nos. 172, 311, 445, 471, 480, 600. The legislative history demonstrates that some drying and processing was to be included within the scope of the SAW program. *See* H.Rep. No. 682, Pt. I, *supra*, at 85. The legislative history, however, specifically excluded packing houses and canneries. If an agency, in the course of determining the meaning of conflicting concepts, chooses a reasonable course of action which is supported by the statute and its legislative history, the Court shall not overturn the agency's determination. *Chevron*, 467 U.S. at 845, 104 S.Ct. at 2783. In light of the comments contained in the administrative record regarding the realities of a farming operation and in keeping with the legislative history of the IRCA, the Court finds that the Secretary acted reasonably in defining field work to not include work performed in packing houses and canneries but to include work performed on or in "land, cave[s] or structure[s]" for the purpose of "planting, cultural practices, cultivating, growing, harvesting, drying, processing, or packing."

## ORDER

In consideration of the cross-motions for summary judgment, the oral arguments of counsel, the entire record of this case, and for the foregoing reasons, it is this 25th day of April, 1988,

ORDERED that plaintiffs' motion for summary judgment is denied; and it is

FURTHER ORDERED that defendant did not arbitrarily and capriciously define "other perishable commodities" and summary judgment shall be entered for the defendant on this issue; and it is

FURTHER ORDERED that defendant arbitrarily and capriciously incorporated

the herbacious requirement within the definition of "vegetables" and summary judgment shall be entered for intervenors on this issue;

FURTHER ORDERED that defendant arbitrarily and capriciously excluded sugar cane from the definition of "other perishable commodities" and summary judgment shall be entered for intervenors on that issue; and it is

FURTHER ORDERED that the issue of whether sugar cane falls within the scope of "other perishable commodities" and the definition of "vegetables" shall be remanded to the agency to conduct further proceedings in accordance with this memorandum opinion. Given the time constraints involved in this case, the agency shall forthwith consider these issues on remand.

field work include sorting and packing "at, in or contiguous to a field site"); Ad.Rec.Doc. No. 559 (comments of the Farm Labor Alliance stating the "essential elements of field work, are not performed specifically in the field ... "agricultural lands" is broad enough to encompass all on-farm field work activities"); Ad.Rec.Doc. No. 597 (comments of FAIR urging limiting

field work to just field work and not work "inside any temporary or permanent fixed structure"); Ad.Rec.Doc. No. 600 (transcript of the Public Meeting on the IRCA sponsored by Congressman Joe Skeen and the New Mexico Farm and Livestock Bureau comments from farmers regarding the realities of what constitutes field work).