**Walso WINT, et al., Appellants,**

v.

**Hon. Clayton K. YEUTTER, et al.**

**No. 89–5123.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 5, 1990.

Decided May 4, 1990.

---

Steven J. Routh, Washington, D.C., with whom Kristine Poplawski was on the brief, for appellants.

Wilma A. Lewis, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., John D. Bates, R. Craig Lawrence, Washington, D.C., and Madelyn E. Johnson, Asst. U.S. Attys., were on the brief, for appellees the Honorable Clayton K. Yeutter, et al.

John M. Simpson, Robert A. Burgoyne and Amee F. Vermilye, Washington, D.C., were on the brief for appellee U.S. Sugar Corp.

Before EDWARDS, RUTH BADER GINSBURG, and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

Alien farmworkers appeal a decision by the district court upholding a U.S. Department of Agriculture (USDA or Department) rulemaking that effectively eliminates sugar cane cutters from the group of seasonal farmworkers eligible for permanent residence in the United States under the Immigration Reform and Control Act of 1986 (IRCA). Satisfied that the Department acted within its statutory authority and provided a reasoned basis for its actions, we affirm.

### I. STATUTORY FRAMEWORK AND CASE HISTORY

IRCA was enacted to reform the nation's immigration laws, largely by controlling illegal immigration into the United States

through, *inter alia*, penalizing employers of undocumented aliens. *See* 8 U.S.C. § 1324a. As part of a congressional compromise between the interests of growers, primarily from the West, who sought assurance that a pool of legal labor would be available to perform temporary field work, and those of farmworkers' rights groups, Congress included in IRCA a new Seasonal Agricultural Worker (SAW) program. *See* H.REP. No. 99–682(I), 99th Cong., 2d Sess. 50–51 (1986) U.S.Code Cong. & Admin. News 1986, pp. 5649, 5654–5655 (hereafter House Report). That program confers on qualifying workers status as lawful immigrants, eligible for permanent residence.

To qualify for the SAW program, applicants must demonstrate that they resided in the United States and performed seasonal agricultural services for at least 90 days during the year ending on May 1, 1986. *See* 8 U.S.C. § 1160(a)(1). IRCA defines "seasonal agricultural services" as "the performance of field work related to planting, cultural practices, cultivating, growing and harvesting of fruits and vegetables of every kind and other perishable commodities, as defined in regulations by the Secretary of Agriculture." 8 U.S.C. § 1160(h).

IRCA also amended an existing foreign guest worker program, the H–2 program, known in its amended form as the H–2A program. Under the H–2A program, an employer may petition the Secretary of Labor, at least 60 days in advance of need, for a certification that

(A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor and services involved in the petition, and

(B) the employment of the alien in such labor or services will not adversely affect the wages and other working conditions of workers in the United States similarly employed.

8 U.S.C. § 1188(a)(1). Foreign workers admitted under H–2A visas, in contrast to those eligible for the SAW program, are not entitled to permanent residence status: they may remain in the United States only as long as they are employed in the particular job for which their visas were issued.

In proposed and final SAW program rules issued on April 22 and June 1, 1987, the USDA's Secretary initially exercised his IRCA-conferred authority to define fruits, vegetables, and other perishable commodities. *See* 52 Fed.Reg. 20,372 (June 1, 1987); 52 Fed.Reg. 13,246 (Apr. 22, 1987). The USDA announced that the Department had selected a botanical definition of "fruits and vegetables"—a definition keyed to particular plant parts, rather than to common understandings of the terms— "because of [that definition's] clear scientific basis." 52 Fed.Reg. at 13,247. The Department also concluded that "other perishable commodities" should be defined so as "to make it clear that the use of alien workers is predicated upon unpredictable circumstances and the more immediate needs for labor which result from those circumstances." *Id.*

The USDA, in its 1987 rulemaking, defined "fruits" as "the human edible parts of plants which consist of the mature ovaries and fused other parts or structures, which develop from flowers or inflorescence," and "vegetables" as "the human edible leaves, stems, roots, or tubers of herbaceous plants." 52 Fed.Reg. at 20,376. In addition, the Department defined "other perishable commodities" as crops, other than fruits and vegetables, "that are produced as a result of seasonal field work, and have critical and unpredictable labor demands." *Id.* The key phrase "critical and unpredictable labor demands," as defined in the June 1987 final rule, means that "the period during which field work is to be initiated cannot be predicted with any certainty 60 days in advance of need." *Id.*[1]

1. A USDA official later explained that the 60–day period was

chosen because it is the minimum application period for the H–2A program. We felt that the 60 days was a reasonable period for those who depended upon foreign labor. Those

who could accurately anticipate labor needs as far as 60 days in advance had less critical labor needs and could use the H–2A program. Where labor needs were more critical because growers could not predict those needs 60 days

The Department provided an exclusive list of nine "other perishable commodities";[2] sugar cane was explicitly disqualified, on the basis that

[s]ugar cane is a perennial grass, not a fruit or vegetable, which is normally harvested between one to two years of growth. It is mature during most of this period. The timing of the harvest is not critical, but is scheduled over a period of several months for the efficient operation of the processing mill.... Harvest dates are quite predictable and may be scheduled several months in advance.

*Id.* at 20,375.

The original plaintiffs, Northwest Forest Workers Association, *et al.*, sued in district court challenging the USDA's definitions as overly expansive. Appellants (alien farmworkers) intervened, claiming, *per contra*, that the definitions were too narrow, and objecting specifically to the exclusion of sugar cane. The district court ruled against the original plaintiffs on all their claims. *See Northwest Forest Workers Ass'n v. Lyng*, 688 F.Supp. 1 (D.D.C. 1988). Turning to appellants' claims opposing those of the original plaintiffs, the district court affirmed in part and remanded in part. That court first upheld the USDA's decision to define "other perishable commodities" in terms of "critical and unpredictable labor demands," as measured by a grower's ability to use the H–2A program, *see supra* note 1; in so ruling, the district judge explicitly determined that the "dividing line between the H–2A program and the SAW program drawn by the 60–day bright line rule was reasonable." *Id.* at 7.

The district court went on to rule, however, that the USDA had acted arbitrarily and capriciously by "failing to adequately explain its incorporation of 'herbaceous' in the definition of vegetables," *id.* at 9,[3] and by neglecting to consider the impact of weather conditions before excluding sugar cane from the list of perishable commodities. *See id.* at 11. The court remanded both issues to the Department. The United States Sugar Corporation then intervened as a defendant in the case.

Responsive to the district court's remand, the USDA issued a second proposed rule on July 11, 1988, *see* 53 Fed.Reg. 26,-076 (July 11, 1988), and a final rule on August 19, 1988, *see* 53 Fed.Reg. 31,630 (Aug. 19, 1988). In this second look phase, the Department concluded, after reviewing several scientific sources, that it had "erred in describing its previous definition of 'vegetables' as a botanical definition," 53 Fed. Reg. at 26,077. The Department stated:

USDA determined to use scientific terms in order to be precise. The term "fruits" is a precise term that has a botanical definition that is accepted universally in the scientific literature. However, the term "vegetables" is not defined precisely in botany.... The term "vegetables," however, is significant in the science of horticulture.

*Id.* at 26,078.[4] The USDA thus adhered to its previous botanical definition of "fruits," "in order to be more precise as to fruits and to resolve the confusion between the classification of fruits and vegetables." *Id.* Simultaneously, the Department adopted a new "horticultural" definition of

---

in advance, then the commodities would be considered perishable. Declaration of Allison T. French, Joint Appendix (J.A.) at 1258.

2. The listed commodities were Christmas trees, cut flowers, herbs, hops, horticultural specialties, spanish reeds, spices, sugar beets, and tobacco.

3. The court noted that "sugar cane appears to be the only plant crop grown for human consumption in the United States which is excluded from the Secretary's definition of fruits, vegetables and other perishable commodities based on the herbaceous requirement." *Id.* at 9 n. 9.

4. Botany is the branch of biology concerned with plant life; horticulture, the science of cultivating plants. In botany, the functions performed by plant parts distinguish fruits from vegetables: fruits are reproductive organs, vegetables are not. *See* C. Wilson & W. Loomis, Botany 259 (3d ed. 1962). In horticulture, fruits and vegetables are classified according to when they are commonly eaten: fruits ordinarily are eaten as a dessert or snack, while vegetables normally accompany the main part of a meal. *See* J. Janick, Horticultural Science 32 (2d ed. 1972).

vegetables, one meaning "the human edible herbaceous leaves, stems, roots, or tubers of plants, which are eaten, either cooked or raw, chiefly as the principal part of a meal, rather than as dessert." 53 Fed.Reg. at 31,639.[5]

The Department also revisited and amplified its determination that sugar cane did not qualify as an "other perishable commodity." The USDA this time explained that adverse weather conditions have relatively little effect on the criticality of labor demands for sugar cane harvesting, because the pace of the harvest is dictated by the limited capacity of the mills to process the cane: even after a freeze, therefore, sugar cane harvesting generally continues at a normal rate. *See* 53 Fed.Reg. at 31,-635. Although the USDA acknowledged that unexpectedly severe weather may lengthen the harvest or increase the desirability of manual, rather than mechanized, harvesting, the Department nonetheless concluded that "the labor requirements of sugar cane are reasonably predictable ... [;] none of the factors cited ... creates a need for additional labor significantly above the levels that had been predicted months in advance." *Id.* at 31,636.

In the decision now on review, the district court upheld the USDA's revised definitions. *See Northwest Forest Workers Ass'n v. Yeutter*, No. 87–1487, slip op. (D.D.C. Feb. 28, 1989) (hereafter Memorandum Decision). After "careful review of the record," the district court found that the Department had satisfactorily addressed the court's "primary concern," *i.e.*, "whether USDA has unreasonably singled out sugar cane for exclusion from the SAW program." *Id.* at 6. The remand, in the district court's estimation, had revealed that concern to be unsubstantial. Noting the broad discretion Congress conferred on the Department to define the terms at issue, the district court concluded that "USDA has established a reasonable basis

on the record for adopting a hybrid definition of the term vegetables to replace its earlier 'pure' botanical definition." *Id.* at 11.[6] The district court also found reasonable the Department's determination that sugar cane is not subject to "critical and unpredictable labor demands," *see supra* p. 78, so as to qualify as a perishable commodity under the USDA's previously-upheld definition.

## II. "FRUITS AND VEGETABLES OF EVERY KIND"

We note at the outset the narrow focus of appellants' challenge. They take issue not with the USDA's "horticultural" definition of vegetables standing alone, nor with the agency's conclusion that sugar cane is outside the ambit of that definition. Rather, they target as irrational the Department's decision to reverse its earlier position by adopting a horticultural definition of vegetables while retaining a botanical definition of fruits.

Appellants begin by positing that the relationship between the terms "fruits" and "vegetables" presents a "pure question of statutory construction for the courts to decide." *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987). Therefore, appellants maintain, the Department's decision to draw from two distinct sciences in defining fruits and vegetables is not entitled to the judicial deference owing when a statute "is silent or ambiguous with respect to [a] specific issue." *Chevron U.S.A. v. NRDC*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Rather than deferring to USDA's choice of disparate definitions for the terms, appellants assert, the court should, by "[e]mploying traditional tools of statutory construction," *Cardoza–Fonseca*, 480 U.S. at 446, 107 S.Ct. at 1221, identify and effectuate an implicit congressional intent that fruits and vegetables be assigned

---

5. The USDA explained that it was retaining the "herbaceous" component of its previous definition because that limitation "is incorporated in many of the horticultural definitions of the term 'vegetables.'" 53 Fed.Reg. at 26,079.

6. The district court further agreed with the Department that, because sugar cane is woody, not herbaceous, sugar cane does not qualify as a vegetable under the USDA's new definition. *See id.* at 13–16. That determination has not been challenged on appeal.

"related meanings." Brief for Appellants at 23.

■ Appellants' reliance on *Cardoza–Fonseca* is misplaced, given Congress' explicit delegation to the USDA of the authority to *define*, not merely to apply, the terms in question. Far from speaking directly "to the precise question at issue," *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781, Congress entrusted to the USDA delineation of the commodities to be included within the SAW program. Congress, in *Chevron's* words, conferred on the Department "authority ... to elucidate a specific provision of the statute by regulation," *id.* at 844, 104 S.Ct. at 2782, and thereby signaled judicial deference. *Cf. Ohio v. U.S. Department of the Interior*, 880 F.2d 432, 443–44 (D.C.Cir.1989) (declining to defer to agency's decision to set damages for natural resource despoilment at the lesser of restoration cost or diminution in use value because, the court determined, Congress, by unambiguously preferring the restoration cost measure, had spoken to the precise question at issue). Moreover, the USDA's definitional regulations, because they implement expressly delegated standard-setting power, carry legislative effect. *See Batterton v. Francis*, 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). Such legislative regulations are controlling unless "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844, 104 S.Ct. at 2782.

Even under *Chevron's* deferential standard of review, appellants assert, the USDA's definitions fail to pass muster. Because the USDA, on remand, both altered its original rationale and arrived at the same result initially vacated by the district court, close consideration of the Department's action is warranted. *See Food Marketing Inst. v. ICC*, 587 F.2d 1285, 1290 (D.C.Cir.1978) ("The agency's

action on remand must be more than a barren exercise of supplying reasons to support a pre-ordained result.").

■ Appellants characterize as manifestly unreasonable the USDA's adoption of a "hybrid" definition of fruits and vegetables. "Under either a consistent botanical or a consistent horticultural approach," appellants assert, "the terms 'fruits' and 'vegetables' form matching halves of a coherent phrase which, in either discipline, includes all crops grown for human consumption." Brief for Appellants at 25. Only by mixing the two definitions, appellants maintain, can a gap be created into which a crop like sugar cane can fall. Appellants' argument, however, assumes a coherence in scientific characterizations of fruits and vegetables not borne out by the record.

Contradicting appellants' contention that the entire universe of edible crops would be included if the USDA did not mix definitions, several scientists advised the Department that looking solely to botany, or solely to horticulture, sugar cane would be typed not a fruit or vegetable, but a perennial grass or industrial crop. *See* J.A. at 419, 422, 427, 430. Moreover, at least one source relied on by appellants notes that horticulture, with its customary emphasis on garden crops, has traditionally excluded whole categories of extensively managed field crops, such as grains. *See* J. JANICK, HORTICULTURAL SCIENCE 32 (2d ed. 1972).[7] In any event, as we explain below, the USDA has provided a plausible account of its reasons for settling on hybrid definitions drawn from both botany and horticulture.

Botany, the USDA once again found on remand, provides the most reliable definition of the statutory word "fruits." *See* 53

---

7. Appellants correctly remark that the USDA has rejected the view that horticulture should be limited to garden crops. *See* 53 Fed.Reg. at 31,632 (maintaining that horticulture should properly cover a range of plants greater than "garden crops" but smaller than "*all* agricultural crops") (emphasis in original). The Department's selective recourse to horticultural definition could be taken to betoken a desire on the

part of the USDA to exclude sugar cane from the SAW program while including other crops, such as wheat, that a pure horticultural definition might leave out. However, as explained *infra* at pp. 81–82, the Department has provided other reasonable justifications for rejecting uniform horticultural definitions of fruits and vegetables.

Fed.Reg. at 26,078. Indeed, the Department noted, the botanical definition appears in horticultural glossaries as well. *See* J. Soule, Glossary for Horticultural Crops 4 (1985) ("Fruit: botanically, a ripened ovary and adnate parts thereof."). Botany's precise concentration on, and limitation to, specific plant parts facilitates classification. One can readily tell from the botanical standard, for example, how to classify such ambiguous comestibles as tomatoes and rhubarb. The common horticultural definition of fruits, on the other hand, serves the classifying purpose less securely. That definition hinges on whether a given foodstuff is "commonly eaten as a dessert or snack." J. Janick, Horticultural Science at 32. A definition so dependent on externalities, *i.e.*, the time and mode of consumption, is surely an uncertain guide to classification.

Vegetables, however, unlike fruits, are not at all well defined in botanical references. Many botanical glossaries supply no definition of the term. *See, e.g.*, S. Blackmore & E. Tootill, The Facts on File Dictionary of Botany 254 (1984); Oxford University Press, Concise Science Dictionary 729 (1984). Others contain definitions so broad as to encompass all plants. *See, e.g.*, R. Little & C. Jones, A Dictionary of Botany 382 (1980) ("Of or pertaining to a plant or plant part."); S. Parker, McGraw-Hill Dictionary of Scientific and Technical Terms 1722 (3d ed. 1984) ("[BOT] Resembling or relating to plants.").

The Department resisted an all-inclusive definition of vegetables as inconsistent with congressional intent. *See* 53 Fed.Reg. at 31,632 (noting that "Congress did not intend the SAW program to apply to *all* agricultural crops") (emphasis in original); *see also Texas Farm Bureau v. Lyng*, 697 F.Supp. 935, 939 (E.D.Tex.1988) (upholding USDA's exclusion of hay from SAW defini-

tions). No congressional design we can discern opposes the Department's view. As the USDA observed, Congress could have said simply "all plants" if Congress had indeed meant just that. *See* 53 Fed. Reg. at 31,633.

Rejecting the "all or nothing at all" definitions of vegetables that botanical reference works supplied, the Department reasonably looked to the horticultural definition (modified to exclude plant parts the Department classified as fruits and thereby to eliminate overlap between the two categories): "the human edible herbaceous leaves, stems, roots, or tubers of plants, which are eaten, either cooked or raw, chiefly as the principal part of a meal, rather than as dessert." 53 Fed.Reg. at 31,639.[8] We cannot condemn as a subterfuge, anymore than we can indict as irrational, the choice the USDA thus made. The record reinforces our persuasion that the judgment call at issue was one the Department properly undertook, for it shows no accepted scientific principles in place; instead, the record reveals the absence of any consensus as to how, or even whether, to define fruits and vegetables. *Compare* R. Barnhardt, Hammond Barnhardt Dictionary of Science 709 (1986) ("In botany, the word *vegetable* is accepted only as a descriptive adjective, not as a noun.") (emphasis in original) *with* J. Haynes, Botany: An Introductory Survey of the Plant Kingdom 471 (1975) ("Many other fruits are referred to as 'vegetables,' a meaningless term botanically because it is used to describe any plant part that is eaten.").

### III. "Other Perishable Commodities"

■ The USDA has defined "other perishable commodities" as crops subject to "critical and unpredictable labor demands."

---

**8.** Appellants assert that the USDA impermissibly performed a *volte-face* on remand, repudiating its previously relied-on botanical definition of vegetables without the benefit of new fact-finding or reference to additional sources not previously available. However, the putative botanical definition in the USDA's initial rule had already included "human edible" and "herbaceous" limitations not found in the botanical

literature. *See Texas Farm Bureau*, 697 F.Supp. at 939–40 (upholding Secretary's inclusion of the "human edible" requirement). The USDA's abandonment of its botanical definition on remand was thus not the complete reversal appellants have attempted to portray; in any event, as we explained above, the agency has provided a reasoned and reasonable basis for its terminological adaptations.

*See* 52 Fed.Reg. at 20,376. Labor demands are deemed "critical and unpredictable" if "the period during which field work is to be initiated cannot be predicted with any certainty 60 days in advance of need." *See id.; see also supra* pp. 78–79 & n. 1.

Appellants do not contest the USDA's 60–day bright line rule separating perishable from non-perishable commodities. As the district court concluded, in drawing that 60–day line, the USDA was effectuating a perceived congressional intent to make the SAW program available primarily to growers who could not use the H–2A program. *See Northwest Forest Workers,* 688 F.Supp. at 6–7 ("The legislative history [of IRCA] ... indicates that the SAW program was intended to be a supplement to the H–2A program."); House Report at 51 ("Regarding perishable commodities, the Committee recognizes that special situations exist that may render the H–2 program less than fully responsive to Western grower needs. Accordingly, the Committee bill establishes a mechanism by which 'special agricultural workers' may be admitted to perform field work in perishable crops."); *see also supra* pp. 78–79 & n. 1.

In assessing the criticality and unpredictability of demands for seasonal workers, the USDA has employed several factors, including "the nature and extent to which the field work activities utilize[ ] labor, the importance of the timing of these activities, [the] effect of a failure to perform these activities and the amount of labor needed." *Texas Farm Bureau,* 697 F.Supp. at 941 (concluding that the USDA properly disqualified hay from the list of "other perishable commodities"). These factors harmonize with an apparent congressional intent, expressed during Senate debate over the Wilson amendment, a proposed guest worker program later replaced by the SAW initiative, that perishability turn largely on the immediacy of labor needs. *See, e.g.,* 131 CONG.REC. S11606 (Sept. 17, 1985) (Sen. Wilson) ("When we say perishable, we are not talking about [crops] that can ripen on a tree and remain there for perhaps a month without injury. We are talking about those that must be harvested immediately when ripe as a function of weather ..., or the crop risks being lost.").

Appellants assert that under a proper application of these factors, sugar cane would be deemed subject to "critical and unpredictable labor demands," and would thus qualify as a perishable commodity under the SAW program. However, ample evidence in the record supports the Department's conclusion to the contrary. First, as the Department noted, sugar cane is mature for several months and can remain in the fields unharvested during maturity without deteriorating significantly; the starting date for the sugar cane harvest is therefore predictable well in advance. *See* J.A. at 417–18, 422, 446. Moreover, the pace of the sugar cane harvest is dictated by the capacity of the mill, not the ripeness of the cane; severe weather conditions therefore do not generally engender a critical need for additional labor. *See id.* at 417, 422, 446, 1038, 1042. Finally, sugar cane growers historically have met their labor needs largely through the H–2 and, later, the H–2A programs. Recourse to those programs necessitated anticipation of labor needs as much as 80 days in advance. The ability of sugar cane growers to engage H–2 and H–2A workers thus bolsters the conclusion that. labor demands in the sugar cane industry are not unpredictable. *See id.* at 446–47, 1003–04.[9]

Appellants dispute the accuracy of the USDA's portrayal. They maintain that even though the starting date of the sugar cane harvest may be predictable, bad

---

**9.** Appellants contend that grower reliance on the H–2 and H–2A programs does not demonstrate the predictability of labor needs in the sugar cane industry. Even under those programs, appellants assert, growers have, after freezes in the fields, requested additional and extended certifications. However, the total number of H–2 and H–2A workers actually needed each year by sugar cane growers generally has not exceeded the projections made in the original applications. *See* J.A. at 446, 1003. While this pattern could betoken exaggeration of projected labor needs in initial certification petitions, resort to such behavior is unlikely. Under the former H–2 and current H–2A programs, growers must provide housing for all imported workers, *see* 8 U.S.C. § 1188(c)(4); padding of certification requests would therefore impose undue and avoidable costs on employers.

weather often requires the growers to extend the harvest; labor needs, appellants claim, are therefore unpredictable in duration if not in onset. However, in considering and rejecting a similar comment during the rulemaking process, the Department stated that "[a] delay of sugar cane field work activity, while it may be undesirable, is not critical *per se*. It is necessary to look beyond the fact of the delay to determine its consequences and whether it requires a labor force on short notice." 53 Fed.Reg. at 31,638. This approach accords with the apparent congressional intent that perishable commodities be limited to those subject to immediate labor needs. *See supra* p. 83. The USDA then reasonably concluded that mid-season adjustments of sugar cane harvesting schedules do not produce immediate labor needs within the meaning of the SAW program.

Appellants further argue that the USDA justified its exclusion of sugar cane from the scope of "other perishable commodities" by requiring sugar cane to meet criteria not applied to other commodities deemed perishable under the SAW program, such as Christmas trees, sugar beets, and tobacco. These "unannounced" criteria included requirements that the labor need "be subject to inflexible time constraints," that severe weather "threaten total crop loss," and that harvesting and cultivation "be incapable of mechanization." Brief for Appellants at 40. As the district court observed, however, the factors appellants labeled unannounced are relevant to the "criticality" (rather than the "predictability") aspect of the USDA's perishable commodity definition. *See* Memorandum Decision at 18; *supra* p. 83. Nor has the Department been shown to have applied criticality considerations inconsistently.

The USDA reasonably concluded, for example, that the 10–day time frame for shaping Christmas trees is more critical than the several-month span of sugar cane harvestability. *See* 52 Fed.Reg. at 20,374. Furthermore, appellants do not seriously dispute the USDA's assessment that because sugar cane is unusually robust, the potential economic loss to sugar cane growers resulting from a freeze is less severe

than that risked by growers of the commodities deemed perishable within the meaning of the SAW program. The Department's observation that the planting, cultivating, and harvesting of sugar cane are largely mechanized, while those activities are more likely to be performed by hand in the case of the commodities listed as perishable, also draws support from the record. *See* J.A. at 706, 1038, 1046, 1047; *see also Texas Farm Bureau,* 697 F.Supp. at 941–42 (upholding USDA's use of mechanization criterion to disqualify hay as a perishable commodity).

We ultimately conclude, as did the district court, that the USDA's exclusion of sugar cane from the "other perishable commodities" category was not arbitrary, but fairly rested on that crop's status as *sui generis* among agricultural products. The Department's judgment, moreover, was consistent with the congressional view of the SAW program as complementary to the H–2A program.

### CONCLUSION

The USDA reasonably defined fruits and vegetables and reasonably declined to declare sugar cane a perishable commodity. Accordingly, the district court's judgment is

*Affirmed.*