Herberto MORALES, Sadot Fabian, Miguel Sanchez, Abraham Ortiz, Arturo Castaneda, Fernando Ortiz, Julio Carbajal, H & E Sod Nursery, Inc., Sodgrowers Association of Mid–America and American Sod Producers Association, Plaintiffs,

v.

Clayton K. YEUTTER, Secretary of Agriculture, Richard L. Thornburgh, Attorney General of the United States Department of Justice, Alan C. Nelson, Commissioner, Immigration and Naturalization Service and James A. Baker, Secretary of State.

No. 87 C 20522.

United States District Court,
N.D. Illinois, W.D.

June 11, 1990.

Vincent H. Beckman, Jean Agathen, Illinois Migrant Legal Assistance Project, Jeffrey J. Baker, John J. Gasparovic, Jones, Day, Reavis & Pogue, Thomas F. Gardner, Jones, Day, Reavis & Pogue, Manuel Sanchez, Kate Collins, Sanchez & Daniels, Chicago, Ill., for plaintiffs.

James G. Hoofnagle, Asst. U.S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ROSZKOWSKI, District Judge.

This action comes before the Court on the parties' cross-motions for summary judgment. For the reasons set forth in the opinion below, this Court grants plaintiffs' motion for summary judgment and orders the commodity sod to be included in the definition of "other perishable commodities" as set forth by the United States Department of Agriculture in their Special Agricultural Workers regulations. Further, this Court denies defendants' motion for summary judgment.

### I. PROCEDURAL HISTORY

The cross-motions for summary judgment which are currently pending represent the third time this Court (including Magistrate P. Michael Mahoney) has dealt with the appropriateness of including or excluding sod as an "other perishable commodit[y]" in the Special Agricultural Workers (hereinafter "SAW") program of the Immigration Reform and Control Act, 8 U.S.C. § 1160 (hereinafter "IRCA"). In September, 1988, the Magistrate issued a Report and Recommendation finding that the United States Department of Agriculture (hereinafter "USDA") arbitrarily and capriciously excluded sod in the USDA's original final regulation defining "other perishable commodities." In addition, the Magistrate found that the USDA violated § 553 of the Administrative Procedure Act (hereinafter "APA") with an inadequate statement of basis and purpose. This

Court, after further briefing, essentially adopted the Magistrate's Report and Recommendation in a Memorandum Opinion and Order memorialized in *Morales v. Lyng*, 702 F.Supp. 161 (N.D.Ill.1988).

As part of this Court's order, the issue of sod's inclusion or exclusion in the SAW program and the definition of "other perishable commodities" was remanded to the USDA for further informal rulemaking. As a result of this Court's order, the USDA promulgated a proposed rule, invited and received public comment and ultimately fashioned a final regulation regarding the inclusion of sod in the SAW program. This process, on remand, resulted once again in sod being excluded from the definition of "other perishable commodities" and hence, the SAW program. The plaintiffs, a collection of sod workers, growers and grower associations, once again move this Court to set aside the USDA's regulations as arbitrary and capricious. The defendants counter with their own motion for summary judgment, requesting affirmance of the actions of the USDA and Secretary of Agriculture Yeutter (hereinafter "Secretary").

## II. STATEMENT OF BACKGROUND FACTS AND DEFINITIONS

■ By way of factual background, the Court refers to the following discussion in the Magistrate's Report and Recommendation:

[T]he case arises from IRCA and a recent amendment to IRCA—the SAW program. One purpose of IRCA was to reduce the flow of illegal aliens into the country. IRCA attempted to accomplish this objective by penalizing employers who hired undocumented aliens. Of course, Congress realized that certain segments of the economy—agricultural ventures in particular, relied on illegal aliens to meet their labor needs. Indeed, even before the enactment of IRCA, the Immigration and Naturalization Act incorporated what is known as the "H–2" program. This program provided for employment of temporary alien workers by employers certified by the Secretary of Agriculture.

[Under the "H–2" program,] [t]he employer would apply for certification with the Secretary by alleging that there were insufficient domestic workers willing to perform a certain task and that alien labor would not affect the wages and conditions of workers in the United States similarly employed. Still, certain segments of the agricultural industry needed more help. As a result, Congress enacted the "H–2A" as part of IRCA. The "H–2A" program merely reduced the relevant time requirements of the "H–2" program. Presently, the government can not require an employer to apply for certified labor more than 60 days in advance of his needs. Again, Congress determined that the needs of certain agricultural interests particularly western growers of perishable commodities who have come to rely heavily on the existence of an undocumented work force were not being met by the "H–2A" program. Thus Congress amended IRCA to include the SAW program. Under the SAW program, certain illegal aliens who qualify to be "Special Agricultural Workers" may attain temporary and eventually permanent residence status. 8 U.S.C. § 1160(a).

*Morales v. Lyng*, No. 87 C 20522, Magistrate's Report and Recommendation, slip op. at 3–4 (N.D.Ill. September 2, 1988).

In order to qualify as a SAW, the statute provides the following prerequisites:

The alien must establish that he has—
(i) resided in the United States, and
(ii) performed seasonal agricultural services in the United States for at least 90 man-days. [sic]

during the 12–month period ending on May 1, 1986. For purposes of the previous sentence, performance of seasonal agricultural services in the United States for more than one employer on any one day shall be counted as performance of services for only 1 man-day.

8 U.S.C. §§ 1160(a)(1)(A) and 1160(a)(1)(B).

### A. *Definitions*

To a large degree, this case turns on the application by this Court of various terms

used by the Secretary and the USDA which are material to a determination of whether sod is an "other perishable commodit[y]." For this reason, it is essential that the Court set forth these terms, their respective definitions and any interrelationship between those terms.

1. "Seasonal"

"Seasonal" is defined by the USDA as follows:

> *"Seasonal"* means the employment pertains to or is of the kind performed exclusively at certain seasons or periods of the year. A worker who moves from one seasonal activity to another, while employed in agriculture or performing agricultural labor, is employed on a seasonal basis even though he or she may continue to be employed during the year.

7 C.F.R. 1d.8.

2. "Seasonal Agricultural Services"

"Seasonal agricultural services" are defined by IRCA as "the performance of field work related to planting, cultural practices, cultivation, growing and harvesting of fruits and vegetables of every kind and other perishable commodities, as defined in regulations by the Secretary of Agriculture." 7 C.F.R. § 1d.9. The term "seasonal agricultural services" is important to the Secretary's determination of whether sod should be included in the SAW program because eligibility for the program is predicated on the individual worker's ability to show that he "performed seasonal agricultural services in the United States for at least 90 man-days … during the 12–month period ending on May 1, 1986."

The foregoing definition of seasonal agricultural services, which determines the eligibility for the SAW program of particular workers and types of agricultural work, contemplates definitions of the terms "field work" and "other perishable commodities."

3. "Field Work"

The USDA has defined "field work" to mean:

> *[A]ny employment performed on agricultural lands for the purpose of planting, cultural practices, cultivating, growing, harvesting, drying, processing, or packing any fruits, vegetables, or other perishable commodities.* These activities have to be performed on agricultural land in order to produce fruits, vegetables, and other perishable commodities, as opposed to those activities that occur in a processing plant or packinghouse not on agricultural lands. Thus, the drying, processing, or packing of fruits, vegetables, and other perishable commodities in the field and the "on the field" loading of transportation vehicles are included. *Operations using a machine, such as a picker or tractor, to perform these activities on agricultural land are included.* Supervising any of these activities shall be considered performing the activities.

7 C.F.R. 1d.4 (emphasis added).

4. "Other Perishable Commodities"

The Secretary defines "other perishable commodities" as follows:

> *"Other perishable commodities"* means those commodities which do not meet the definition of fruits and vegetables, that are produced as a result of seasonal field work, and have critical and unpredictable labor demands. This is limited to Christmas trees, cut flowers, herbs, hops, horticultural specialties, spanish reeds (arundo donox), spices, sugar beets, and tobacco. This is an exclusive list and anything not listed is excluded. Examples of commodities that are not included as perishable commodities are animal aqua cultural products, birds, cotton, dairy products, earthworms, fish including oysters and shellfish, forest products, furbearing animals and rabbits, hay and other forage and silage, honey, horses and other equines, livestock of all kinds including animal specialties, poultry and poultry products, sod, sugarcane, wildlife and wool.

7 C.F.R. § 1d.7 (emphasis added).

5. "Critical and Unpredictable Labor Demands"

The USDA has defined "critical and unpredictable labor demands" as follows:

[T]he period during which field work is to be initiated cannot be predicted with any certainty 60 days in advance of need. 7 C.F.R. 1d.3.

Herein lies the controversy. The parties' current dispute appears to center on the definition of what constitutes "critical and unpredictable labor demands." Plaintiffs advocate a broad construction of the term, which would include any and all activities where field work is to be initiated without the ability to predict labor demands with any certainty and at least 60 days in advance of need. Defendants, on the other hand, argue that the 60–day predictability rule is not the only dispositive factor in determining eligibility for the SAW program. Defendants contend that "critical and unpredictable labor demands" include, by definition, a two-prong test which has a "critical" component and an "unpredictable" component.

## III. DISCUSSION

### A. Standard of Review

■ The instant controversy is one of a number of cases addressing the appropriateness of the USDA's SAW regulations. *See, e.g., Northwest Forest Workers' Ass'n v. Lyng*, 688 F.Supp. 1 (D.D.C.1988) (sugar cane exclusion from SAW program) *aff'd sub nom.*, 902 F.2d 76 (D.C.Cir.1990); *Texas Farm Bureau v. Lyng*, 697 F.Supp. 935 (E.D.Tex.1988) (exclusion of hay from SAW program). While these cases deal with different commodities and, consequently, different factual inquiries, they all employ the same "arbitrary and capricious" standard of review. Indeed, the parties do not disagree about using the arbitrary and capricious standard in the present case, however, they do disagree over how the standard should be applied. This Court acknowledges that judicial review of an agency's promulgation of rules pursuant to an express delegation from Congress must employ an "arbitrary and capricious" standard of review. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). In other words, the reviewing court may not substitute its judgment for that of the agency and will not overturn the USDA's actions unless such actions are without a rational basis or against the manifest weight of the evidence. *Id.; Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

While according the agency's decision the utmost deference, the applicable standard of review requires a reviewing court to thoroughly examine the basis for the agency's decision. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971). Moreover, a thorough examination is particularly appropriate where, as here, the rulemaking under question is the result of a remand order. The rationale is that an agency may act defensively when an agency's work product is challenged. *Northwest Forest Workers Association v. Yeutter*, slip op. at 4–5 (D.D.C. February 28, 1989) (order after remand to USDA granting summary judgment to the USDA) [this unpublished order will hereinafter be referred to as *Northwest Forest Workers II*].

■ In judging the rationality of the regulation, the reviewing court may only consider the material that was before the agency at the time of its rulemaking and the agency's explanation for the promulgation of its rule.[1] *San Luis Obispo Mothers for Peace v. NRC*, 751 F.2d 1287, 1325 (D.C.Cir.1984), *cert. denied*, 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986). In the instant inquiry, the Court will pay particular attention to those matters this Court found to be arbitrary and capricious in its earlier ruling.

---

1. The defendants provide a declaration from Edward B. Knipling in support of their finding. The Court, however, finds such after-the-fact declaration of limited or no use for our purposes. *Motor Vehicle Mfrs.*, 463 U.S. at 43–44, 103 S.Ct. at 2867, 2870; *cf. Camp v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973). The Court, as stated above, is limited in its review to the material which was before the agency at the time the agency's decision was rendered.

In addition, the defendants urge this Court to defer to the USDA's expertise regarding inclusion or exclusion of sod in the definition of "other perishable commodities." This is what the Court intends to do and what the applicable standard of review mandates.

### B. Decision of the Court

Initially, this Court notes with concern that the agency, in promulgating its final rule, disagrees with all of the public comments it received. This Court does recognize that the USDA did document reasons behind its disagreement with the public comments. In fact, the USDA filled seven three-columned, single-spaced pages of the Federal Register explaining its rationale for excluding sod. However, the USDA could not cite to one public comment in support of its position.

### 1. Seasonality

Prior to the remand in this case, the plaintiffs complained vigorously about the insufficiency of the record relating to whether sod is seasonal. Plaintiffs cannot now complain, as they have in the past, of a meager record. A complete record now essentially concedes that sod is seasonal.

The USDA found as follows:

[U]pon review of the various operations with respect to sod production, USDA recognizes that certain other practices, at least in some areas, may be limited to certain seasons or periods of the year. Therefore, USDA has examined these operations which are limited, at least in some areas of the United States, to certain seasons of the year to determine whether such seasonal field work creates a critical and unpredictable demand for a labor force.

53 Fed.Reg. 30376. While defendants maintain in their briefs that the point regarding the seasonal nature of sod has not been conceded, the record quoted above demonstrates otherwise. This Court finds that the defendants have, in fact, recognized that sod has characteristics of seasonality and there is no support for a contrary position.

### 2. Critical and Unpredictable Labor Demands

The plaintiffs contend that sod belongs in the SAW program as an "other perishable commodit[y]." Specifically, the plaintiffs contend that the USDA erred in finding that sod field work did not suffer "critical and unpredictable labor demands."

As already discussed by this Court in Section II(A)(5), *supra*, the term "critical and unpredictable labor demands" has been defined as follows:

[T]he period during which field work is to be initiated cannot be predicted with any certainty 60 days in advance of need.

7 C.F.R. 1d.3. In short, the USDA believes sod field work does not implicate "critical and unpredictable labor demands" and, hence, sod is not an "other perishable commodit[y]." To arrive at this conclusion, however, the USDA manipulated the very definition it created.

### a. Validity of the Two–Prong Analysis

The USDA argues that "critical and unpredictable labor demands" contains a two-prong test containing a "critical" prong and an "unpredictable" prong. This Court does not agree that the term "critical and unpredictable labor demands" inherently involves the application of a two-prong test. However, for the sake of clarity, this Court will discuss the USDA's determination in the context of their two-prong argument, first addressing their argument on criticality and second addressing their argument on predictability.

### b. Criticality

In support of their position that a two-prong analysis should be employed, the USDA points out that in two similar cases federal district courts have recognized a "criticality" prong. *See Northwest Forest Workers II, supra,* slip op. at 18; *Texas Farm Bureau, supra,* 697 F.Supp. at 941–42. Defendants are now attempting to replace in total the "more precise criteria" of "critical and unpredictable labor demands" as defined in 7 C.F.R. 1d.4 with the previously rejected concept of mechanization.

The USDA states that "[i]n determining whether a commodity meets the definition of critical and unpredictable labor demands, USDA must examine the degree to which the production of a commodity has been mechanized.... Highly mechanical crops do not generally experience a critical need for a labor force on a short notice." 53 Fed.Reg. at 50376.

The USDA's concentration on this single factor affecting labor demand, "mechanization," elevates that factor into a *de facto* definition for "critical and unpredictable labor demands." According to the USDA, "[h]ighly mechanized crops do not generally experience a critical need for a labor force on short notice." 53 Fed. Reg. at 50376.[2]

The USDA substituted the clearly defined "critical and unpredictable labor demands" criteria used for other commodities with the concept of mechanization as the preferred criteria to determine whether sod is an "other perishable commodit[y]." In short, the USDA effectively redefined the meaning of "critical and unpredictable labor demands" from what it once was—the "period during which field work is to be initiated cannot be predicted with any certainty 60 days in advance of need"—to "a critical and unpredictable demand for a *large number of manual laborers* on short notice." 53 Fed.Reg. at 50376 (emphasis added). "Mechanization" on the one hand, and "critical and unpredictable labor demands" on the other, are not the same. For the USDA to suggest that they are for purposes of sod is an arbitrary departure from past declarations and actions of the USDA.

To be sure, the USDA characterizes mechanization as only one factor in determining "critical and unpredictable labor demands," but this semantical exercise pays no more than lip service to the "critical and unpredictable labor demands" criteria and definition promulgated by the Secretary and used to categorize other commodities. The USDA explicitly acknowledges the supremacy of "mechanization" over other criteria when it states the following:

> There is a clear expression of congressional intent in the legislative history of the Act that the Special Agricultural Worker Program (SAW) program [sic] was to include as "other perishable commodities" crops which "must be harvested by hand, thereby requiring a large number of workers on short notice," and not "where mechanical harvesters *can* be used * * *."

53 Fed. Reg. at 50376 (citations omitted).[3] This Court has serious trouble reconciling this statement with Mr. French's[4] declarations in *Northwest Forest Workers*, 688 F.Supp. 1 (D.D.C.1988), "discarding suggestions of defining perishability in terms of labor intensity, the degree of dependence on illegal aliens, the rate of deterioration and the impact of weather conditions...." *Id.* at 5.

After rejecting the factors noted above, the USDA originally opted for a simple yet precise criterion—can a farmer predict with some certainty, and within sixty days, the period during which field work is to be initiated. This is the relevant criterion with which the USDA must judge commodities. Undoubtedly, factors such as weather and perishability may affect a farmer's ability to predict the initiation of field work, and, as such, these factors have some relevance for the USDA's rulemaking. However, the mechanization factor cannot totally eclipse the already-defined criteria of "critical and unpredictable labor demands."[5] This Court finds that the

---

**2.** Again, under somewhat different circumstances, it would appear that the use of "mechanization" as a talismanic measure of "critical and unpredictable labor demands" would be reasonable and entirely within the province of the USDA to select.

**3.** *See infra* note 6 and accompanying text.

**4.** Pursuant to the statutory authority to promulgate definitional regulations, and in order to oversee the rulemaking, the Secretary appointed Allison T. French to the temporary position of Acting Special Assistant for Labor Affairs to the Assistant Secretary for Economics in the United States Department of Agriculture. It is the declarations of French to which the quote refers.

**5.** While the USDA may point to sod and hay as examples of commodities effectively excluded due to their degree of mechanization, there are several other examples of commodities where a

USDA's current deviation from their past practice to be arbitrary and capricious.

With due respect to the district courts which have recognized the two-prong test, *see Northwest Forest Workers II, supra,* and *Texas Farm Bureau, supra,* this Court only recognizes the "criticality" of labor demand as it is incorporated in the USDA's own definition and will not recognize a new and separate "criticality" prong as part of an already inclusive definition. The cases that the USDA cites to this Court are district court opinions and carry persuasive weight only to the extent that their logic and reasoning dictate. In the instant case, this Court sees no support in the record or in the cited-to district court opinions for the adoption of a new or substantially modified definition.[6]

As the USDA is charged by Congress to define such terms as "critical and unpredictable labor demands," under normal circumstances the USDA's two-prong definition would appear sensible and deserving of due deference. The problem in the instant circumstance, however, is that the USDA has already defined the term "critical and unpredictable labor demands" to mean that the "period during which field work is to be initiated cannot be predicted with any certainty 60 days in advance of need." 7 C.F.R. 1d.3. The Court finds no two-prong test evidenced in this definition. In addition, the Court finds no support whatsoever for going outside the definition which has been provided by the USDA.

On remand, and in support of the position that sod does not experience a critical demand for a labor force on short notice, defendants' contend that that sod is a highly mechanized crop. The problem, however, is that "mechanization," or more generally "the nature and extent to which the

---

degree of mechanization was not summarily equated with an absence of critical and unpredictable labor demands. One such prime example is the commodity hops. The administrative record, created during the consideration of hops for the SAW program, reveals a significant amount of mechanization as reflected in the amount of machinery used in cultivating hops. (Plaintiff's Exhibits E, F). Despite this evidence of mechanization, the USDA recognized that mechanization did not necessarily ameliorate the need for laborers, be they manual laborers or machine operators.

Other commodities, including Christmas trees and sugar beets, that utilize machinery in their cultivation, were also found by the USDA to require considerable amounts of laborers. (Plaintiff's Exhibit 6). Therefore, in at least these other cases, the USDA did not use the degree of mechanization as a proxy for the absence of critical and unpredictable labor demands when considering these commodities for inclusion in the SAW program as an "other perishable commodit[y]."

**6.** One caveat to this reasoning does exist. In determining whether an agency's decision is consistent with the statutory mandate provided by Congress, the Court must determine whether Congress itself has spoken directly on the issue. "If the intent of the Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguous expressed intent of Congress." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If the court determines, however, that there is no unambiguous intent to be found in the legislation, "the court does not

simply impose its own construction on the statute ... [r]ather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782. It is principally under these circumstances that the deferential standard discussed above comes into play. The determination of whether or not the agency's interpretation of the legislation is reasonable is confined to an inquiry of the statements and materials which appeared before the agency during its rulemaking process. *AFL–CIO v. Brock,* 835 F.2d 912, 918 (D.C.Cir.1987) citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983).

The USDA and the Secretary do cite to numerous comments in the Congressional record outlining certain Congressperson's views on what the legislation was intended to provide. Apparently this did not provide sufficient support for excluding all "mechanized" crops or including a two-prong definition that encompassed references to mechanization; in fact, the Secretary specifically *included* mechanized processes within the definition of "field work." *See* 7 C.F.R. 1d.4. In addition, those references to statements made by certain Congresspersons do not unambiguously demonstrate to this Court Congress' intent with regard to inclusion or exclusion of mechanized processes within the SAW program. This Court believes that the ultimate determination was left to the Secretary and the USDA, and that the determination by those parties is adequately reflected in the definitions provided by the Secretary.

field work activities utilize labor" was rejected by the Secretary as a workable criteria to determine an "other perishable commodit[y]." As was stated in *Northwest Forest Workers' Ass'n v. Lyng*, 688 F.Supp. 1 (D.D.C.1988),

> [t]he agency discarded suggestions of defining perishability in terms of labor intensity ... due to the 'difficulties in measuring some criteria and the overinclusiveness of other criteria.' French Decl. I ¶ 9. The agency chose critical and unpredictable labor demands as consistent with the legislative history and the more precise and manageable criteria. French Decl. I ¶ 9; French Decl II ¶ 2."

*Id.* at 5.

The Court also recognizes some separate and independent reasons for rejecting the USDA's rule regarding "criticality." Assuming the validity of the harsher criteria discussed above, the USDA's conclusions based on the public comments received, other "sod authorities," and its own expertise might at first blush appear rational. Yet, even under the USDA's new "mechanized"-based criteria, the USDA's opinions on sod cultivation strains credibility and again portends a pre-ordained result on the issue of sod's inclusion in the SAW program.

In their explanation of their final rule, the defendants examined all the areas of sod work that the public comments indicated caused or contributed to sod work's critical and unpredictable labor demands. In almost every area, the USDA discounted the commenters' suggestions as confused or provincial. Of course, the USDA's treatment of the comments may be entirely within the USDA's realm of authority, regardless of the prominence or expertise of the commenters.[7] As the defendants explicitly point out, the administrative process cannot be held hostage to special interests who may "stuff a comment box." Areas of the USDA's explanation, however, depart not only from the commenter's point of view, but also from rationality in gener-

al. For example, the USDA states the following:

> According to the American Sod Producers Association, the average sod farm of 125 to 199 acres requires 5 to 9 employees during the "high season," which is generally 9 months in the northern United States, and 3 to 5 employees during the "low season," which is generally 3 months. Other comments that indicated the number of workers they require for sod production stated that they generally reduce their work force by half during the "low season." This pattern of employment does not indicate a critical and unpredictable demand for large numbers of workers. Rather, it indicates a reduction in employment during the "low season" and a return to the normal work complement during the "high season."

   \*    \*    \*    \*    \*    \*

USDA notes that, assuming this farm harvests only half of its 900 acres each year, it would be necessary to harvest an average of 115,000 square feet per weekday. This suggests that the harvesting operation on this farm is largely a continuous operation. USDA also recalls that in 1987, this same commenter states:

The manager of a 500 acre farm commented:

> [t]o harvest sod, it takes a crew of four men about 8 hours/acre, or 32 man hours/acre....

     \*    \*    \*    \*    \*    \*

This year we employed about 35 total field laborers. Assuming that this grower harvest half of his 500 acres each year, his normal complement could, if it were critical to do so, harvest the year's crop in 52 man days. It seems more likely that the limit of harvesting capacity in this case is the number of harvesting machines available rather than the amount of labor....

     \*    \*    \*    \*    \*    \*

One authority commented that:

---

7. Indeed, at one point, the defendants discount a comment advocating the inclusion of sod in the SAW program. In fact, the comment was made by a sod authority whose publication the defendants quote in support of excluding sod! *See* 53 Fed.Reg. at 50379.

[f]ew farms cut enough sod on a daily basis to be able to support a full crew of laborers needed for harvesting * * * [T]he rate of harvest can not be spread out over a season or over a single day in order to keep a full crew busy.

The comment of the manager of a 900 acre sod farm which operates eight months of the year was typical of such comments, but provided somewhat greater detail:

Due to ... extreme fluctuation[s] in weather conditions, our labor needs are *very* unpredictable.... [O]ur farm cannot predict with any certainty when field work is to be initiated 60 days in advance. We cannot even predict from one day to the next many times what out labor needs will be.... One day we might cut 100,000 or 200,-000 square feet of sod and the next day or a few days none or very little at all. ...

53 Fed. Reg. at 50379.

With regard to the USDA's emphasis on the average number of workers, the average number of workers a sod farm employs during its "high" season says precious little as to the predictability, or lack thereof, of need for laborers during that "high" season. Every farming operation would be able to arrive at an average number of employees employed during a season; however, this number has no correlation or relevancy to proving the existence of a substantially "normal work complement." Nor does the average number of acres harvested per day necessarily correlate to the actual number of acres harvested on any particular day of the season. The average number of acres harvested per day, in turn, does not reflect the actual day-to-day, week-to-week fluctuation in harvesting operations—the most dispositive factor of the issue of critical and unpredictable labor demands. The fact that a particular grower employed a total of 35 workers last year does not mean that 35 workers were part of his "normal work complement" and available on demand for harvesting. The USDA constantly and erroneously equates the average number of workers employed by a farm to the number of workers who are permanently available. The USDA thus arrives at a fallacious conclusion that sod growers have a normal work complement of substantial numbers.

In further support of their view of substantial work complements on sod farms, the USDA quotes as its sole sod authority an Auburn University publication about turfgrass sod production in Alabama. The Court finds such total reliance curious since the USDA emphasizes the need to examine sod production on a national basis yet ignores comments from all over the country in deference to one study from and about Alabama. (See Reply Memo of Plaintiff' Exhibit C).

Other parts of the USDA's explanation for excluding sod ironically argue that labor demand in sod is too unpredictable.

Many commenters stated fluctuating consumer demand made it impossible to forecast harvest requirements even from one day to the next. USDA believes that this condition, rather than creating a demand for a labor force on short notice, requires sod producers to maintain the necessary equipment and regular employee complement sufficient to meet anticipated consumer demand. Otherwise, the sod industry would have to have a pool of unemployed laborers on constant standby ready to work on a day-to-day basis. USDA does not believe that sod products have operated in that manner in the past, nor is the SAW program, which is not remedial, intended to enable them to do so in the future.

\* \* \* \* \* \*

Many commenters cited the need for irrigation as an example of a condition which caused critical and unpredictable labor demands. An official of the American Sod Producers Association claimed that:

It is my understanding that an entire sod field can be destroyed in hours or days from the point of seeding to harvest. Sod is extremely susceptible to the effects of too much or not enough rain and numerous varieties of weed,

disease and insects. If the required field labor is not available to address these needs immediately, sod crops are lost.

USDA recognizes that many plants, including some sod, may drown or scald if inundated. However, such a criterion would be too broad to determine inclusion within the definition of seasonal agricultural services. USDA believes that if Congress had wanted such a universal criterion to be used they would have simply said that "all crops" should be included. Moreover, USDA believes that under generally accepted farm management practices, such a flooding condition should only occur under extreme conditions or in the case of inadequate drainage or water management on a farm. In either case, damage which may occur in a matter of hours is not likely to be significantly alleviated regardless of labor availability.

53 Fed. Reg. at 50380.

The USDA again departs from the definition of "critical and unpredictable labor demands" by excluding sod, not because a sod farmer cannot predict the initiation of field work 60 days in advance, but because he cannot predict the number of workers needed a few hours or a few days in advance. The USDA turns the relevant criteria upside down and now sod field work's labor demands appear too "critical and unpredictable" to be included as an "other perishable commodit[y]."

Still other excerpts of the USDA's explanation are simply illogical. For example, the USDA states that

[t]he pre-harvest irrigation of sod is similarly predictable and the consequences of not doing so is not critical to the plants. If the grower is unable to perform the pre-harvest irrigation, he has the opportunity to delay his harvest schedule.

53 Fed.Reg. at 50380. Simply put, the USDA contends that if sod is in need of water, failure to irrigate the crop will not be detrimental to the crop itself. Instead, the farmer need only delay his harvest schedule. The Court questions what becomes of the crop which is in the field in need of irrigation. Unless the Court is mistaken in this respect, without irrigation the sod will die and harvesting, regardless of the time frame, becomes an irrelevancy. From this the Court can further conclude that the USDA, using a harsh new standard and, at best, spotty reasoning, has arbitrarily and capriciously excluded sod from the SAW program.

### c. Predictability

While the USDA does not dwell on the so-called "predictability" prong in their analysis, the USDA does find that labor demand for sod work is predictable (i.e., any need for workers is known at least 60 days in advance of field work). Therefore, the Court will address this portion of the USDA's conclusions. The USDA gives few reasons independent of "mechanization" for its conclusion on predictability. Indeed, the USDA actually quotes comments from its original rulemaking which have already been discounted by this Court, even where the authors of these original comments have explained their original intent in light of the USDA's original interpretation.

Nonetheless, the USDA uses these old comments and a few others to support its findings while once again ignoring an overwhelming majority of comments directly addressing the predictability or lack thereof of sod's labor demands. The great majority of comments unequivocally confront the "60–day" bright line rule while others merely explain the unpredictability of labor demand in more practical terms. See Admin.Record; Pl.Exhibit D. The USDA inexplicably ignores these straightforward comments and embraces oblique remarks from questionable authority.

In particular, the USDA incorporates a comment from an Alabama "sod authority" for the proposition that good sod workers are kept throughout the season. Another USDA preferred comment relates to how laborers may work on a sod farm in several different capacities. While these comments may potentially lend some support to the USDA's conclusion of the predictability of the labor demands for sod work, they

alone cannot provide a rational basis for the USDA's finding. The existence of permanent workers or even versatile workers on a sod farm does not compel or even suggest that labor demand is predictable, particularly in light of the myriad of undisputed comments regarding sod's unpredictable labor demands. Moreover, contrary to the USDA's intent to focus on sod cultivation nationwide, the USDA supports its finding of predictability of labor demand on an Auburn University study exclusively looking at Alabama turfgrass production, and ignores comments from throughout the nation supporting a finding of predictability.

In sum, old comments, one comment from an Alabama study and one innocuous comment on the versatility of sod laborers is too thin a reed to support the Secretary's finding on predictability even under an arbitrary and capricious standard. This is particularly true in light of the undisputed comments supporting predictability.

## IV. REMEDY

As indicated above, when reviewing a decision under an arbitrary and capricious standard, this Court is justifiably reticent to overturn a decision, let alone replace it. This case, however, presents one of those rare circumstances where a decision of an administrative agency cannot be upheld. The Court is now faced with the difficult task of meting out the appropriate relief. In this Court's earlier order, the Court essentially found that the defendants had ignored relevant comments in its rulemaking and thus remanded the case to the agency in the hope that the comments would be considered in an adequate manner. While the USDA did indeed consider the comments this time, the USDA subjected the comments, and more importantly the commodity sod, to a different and more harsh standard for inclusion in the SAW program.

This pattern suggests that the agency's decisionmaking process is somewhat entrenched and may not be equal to the task of freshly and objectively viewing a twice remanded issue. The Court, however, is in little better position, lacking the necessary expertise on sod production. The Court, barring timely advice from the parties to the contrary, sees no choice but to order the commodity sod to be included in the definition of "other perishable commodities." The Court orders the USDA to take all necessary steps to carry out and effectuate this order.

## V. CONCLUSION

For the reasons set forth in the foregoing opinion, this Court holds that the USDA's exclusion of the commodity sod as an "other perishable commodit[y]" and, hence, exclusion of the commodity sod from the SAW program, was arbitrary and capricious. Therefore, the Court orders the commodity sod to be included in the definition of "other perishable commodities" and further orders the USDA to take all steps necessary to carry out and effectuate this order.