# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3905

_____

| | | |
|---|---|---|
| St. Mary's Hospital of Rochester, Minnesota; Rochester Methodist Hospital, | * * * * | |
| Appellants, | * * | |
| v. | * * * | Appeal from the United States District Court for the District of Minnesota. |
| Michael O. Leavitt,[1] in his official capacity as United States Secretary of Health and Human Services, | * * * * | |
| Appellee. | * | |

_____

Submitted: November 19, 2004
Filed: July 28, 2005

_____

Before SMITH, BEAM, and BENTON, Circuit Judges.

_____

BEAM, Circuit Judge.

St. Mary's Hospital and the Rochester Memorial Hospital filed suit in the district court against the Secretary of Health and Human Services. The suit sought review of the Secretary's denial of the hospitals' claim for approximately $4.1 million

_____

[1]Michael O. Leavitt has been appointed United States Secretary of Health and Human Services and is substituted as appellee under Federal Rule of Appellate Procedure 43(c).

in Medicare reimbursements.  The district court granted the Secretary's motion for summary judgment.  The hospitals appeal and we affirm.

## I.      BACKGROUND

### A.      The Medicare Scheme

#### 1.      DRG Payments and Bundling

Medicare is health insurance funded by the federal government for the aged and disabled.  Before 1983, the government reimbursed hospitals for the actual costs of treating Medicare patients, subject to a reasonable-cost limitation.  In 1983, the government changed its method of reimbursement to a prospective payment system. Social Security Amendments of 1983, Pub. L. No. 98-21, Title VI, 97 Stat. 65, 149-72.  That change instituted a set of flat-rate reimbursements for hospitals treating Medicare patients.  The reimbursement rates were set according to historic costs in a given region and applied on a prospective basis to the hospitals during the upcoming fiscal year.  These new payments were made according to patients' diagnoses.  Thus, with regard to a Medicare patient, treating hospitals would get a payment that was tied to the patient's diagnosis related group (DRG).

For some hospitals, outside entities provided ancillary services to the hospitals' patients—e.g., laboratory, radiology, and physical therapy services.  Before 1983, Medicare allowed such ancillary providers to bill Medicare directly, under Part B, for the reasonable costs those providers incurred in providing their services.  The hospitals would bill their own charges to Medicare separately, under Part A.  In 1983, as part of instituting the prospective payment system and its DRG-based reimbursement scheme, Congress required hospitals to bundle (or refrain from unbundling) the expenses associated with patient care, including the costs of services furnished by outside providers.  42 U.S.C. §§ 1395y(a)(14), 1395cc(a)(1)(H).

Keeping costs together, however, posed significant problems to hospitals that had followed a practice of having ancillary providers furnish services and seek reimbursement from Medicare separately because their accounting and billing systems would have to be changed. So Congress provided a waiver of the bundling requirements for hospitals that needed time to change. The waiver provision—section 602(k) of Pub. L. No. 98-21, 97 Stat. at 165-66, which was later included in the U.S. Code as a note to 42 U.S.C. § 1395y (Supp. I 1982)—gave the Secretary the power to allow such hospitals and their ancillary providers to continue their practice of separately billing unbundled charges "for any cost reporting period beginning prior to October 1, 1986." 97 Stat. at 165. According to the section 602(k)-waiver provision, "Any such waiver shall provide that [the ancillary providers'] billing may continue to be made under part B of such title but that the payments to such hospital under part A of such title shall be reduced by the amount of the billings for such services under part B of such title." Id. at 165-66. The part B payments to the ancillary providers were not calculated according to the patient's DRG. Rather, those payments were calculated on a reasonable-cost basis. Thus, Medicare would reimburse ancillary providers according to what it cost the ancillary provider to provide the services. Under the waiver provision, then, a waiver hospital's DRG payment was reduced by the reasonable costs of ancillary services billed by and paid to the ancillary provider.

### 2. Teaching Hospitals

When Congress implemented the DRG system, it was concerned that those payments would not adequately reimburse teaching hospitals because such hospitals typically have higher costs per patient than non-teaching hospitals. S. Rep. No. 98-23, at 52 (1983), reprinted in 1983 U.S.C.C.A.N. 143, 192; H.R. Rep. No. 98-25, at 140 (1983), reprinted in 1983 U.S.C.C.A.N. 219, 359. Thus, the DRG payment—calculated on average per-patient costs in a particular region—would not reflect teaching hospitals' increased expenses. The prior reimbursement system also

had this problem because the reasonable-cost limitations it used were similarly calculated, though not on a prospective basis. Under the prior system, Congress had allowed adjustments to the reasonable-cost limitations if a provider could show its increased costs were due to its educational activities. Under the new system, Congress carried forward the policy of paying teaching hospitals more, allowing their increased expenses to be separately reimbursed by Medicare. Three types of increased costs were identified: direct medical education (DME) expenses, capital expenses, and indirect medical education (IME) expenses. DME expenses are expenses like residents' salaries—quantifiable expenses directly related to teaching. Capital expenses are those expenses like depreciation and rents. And IME expenses reflect the general inefficiencies associated with patient care provided by residents and interns, including "the additional tests and procedures ordered by residents as well as the extra demands placed on other staff as they participate in the educational process." Id.

IME expenses are not easily quantified. So the Secretary created a formula to calculate how much money teaching hospitals would get for IME expenses. That formula—derived from a statistical analysis of teaching hospitals' costs compared to non-teaching hospitals' costs that takes into account the ratio of residents and interns to beds, 45 Fed. Reg. 21,584 (Apr. 1, 1980)—basically allows teaching hospitals to get a payment that represents a fraction of their DRG revenue. For example, if the Secretary's formula—which is now codified in 42 U.S.C. § 1395ww(d)(5)(B)—yields an "indirect teaching adjustment factor" of .10, then a teaching hospital that has $10,000 of DRG revenue in a given cost reporting period (i.e., fiscal year) would get an additional payment of $1,000 as reimbursement for IME expenses.

B.      The Mayo System and the Hospitals' IME Reimbursements

St. Mary's, Rochester, and the Mayo Clinic are all teaching facilities. The two hospitals house patients who are treated by the Mayo Clinic's physicians, residents,

and interns. The Mayo Clinic also provided ancillary services to the hospitals' patients. Before the 1983 changes took effect, the Mayo Clinic billed Medicare separately for the ancillary services that it provided to the hospitals' patients. Under the bundling provisions, however, those charges would need to be billed by the hospitals, who would then pay the Mayo Clinic for its services. But St. Mary's and Rochester were given a section 602(k) waiver. Thus, during the cost reporting periods at issue[2] the Mayo Clinic billed Medicare for the reasonable cost of the ancillary services it provided to the hospitals' patients. And these payments reduced the hospitals' DRG payments.

St. Mary's and Rochester disputed their Medicare reimbursements for the relevant cost reporting periods with their fiscal intermediary, Blue Cross and Blue Shield of Minnesota, claiming that they had been deprived of reimbursement for DME, capital, and IME expenses that they had incurred. Blue Cross sought advice from the Health Care Financing Administration (HCFA).[3] The HCFA responded on August 24, 1984, with a letter from Michael J. Angellotti, the Chief of the Reimbursement and Recovery Branch of the Division of Financial Operations.

Mr. Angellotti dealt with two issues that Blue Cross had apparently raised, both of which questioned the extent to which the Mayo Clinic's charges should reduce the hospitals' DRG payments. The first dealt with DME and capital expenses. Mr. Angellotti reasoned that the Mayo Clinic's payments, the amount of which was determined on a reasonable-cost basis, included some amount of capital and DME costs that the Mayo Clinic had incurred and billed to Medicare as reasonable costs. "[I]n the interest of equity," Mr. Angellotti concluded that the hospitals should not be

---

[2]St. Mary's disputes its reimbursement for the cost reporting periods beginning on July 1, 1984, and July 1, 1985. Rochester disputes its reimbursement for the cost reporting periods beginning on January 1, 1984, and January 1, 1985.

[3]The HCFA is now known as the Centers for Medicare and Medicaid Services.

charged with the Mayo Clinic's capital and DME costs through a reduction in the hospitals' DRG payments. In other words, Mr. Angellotti concluded that the offset that the section 602(k) waiver required had to be reduced. To make that reduction, he concluded that Blue Cross should determine what portion of the Mayo Clinic's total ancillary-services charges were attributed to DME and capital costs. This was to be done by multiplying the total nonphysician charges by the "ratio of capital and direct medical education cost to total cost of the [Mayo Clinic]." The resulting amount was not to be included in the reduction of the hospitals' DRG payments. Thus, he told Blue Cross to reduce the 602(k)-waiver offset by the amount of the charges that were attributed to the Mayo Clinic's DME and capital costs.

The second issue that Mr. Angellotti dealt with was whether the hospitals were entitled to an "indirect teaching adjustment" based on an unreduced DRG payment—i.e., an IME payment calculated from the DRG payment before the 602(k)-waiver offset for the Mayo Clinic's payments. Mr. Angellotti concluded that

> [the hospitals] do not incur indirect medical education costs in the ancillary departments where the ancillary services are provided by the Mayo Clinic. Therefore, the indirect teaching adjustment factor should be applied to the . . . [hospitals'] Medicare payments . . . net of the . . . billings of the Mayo Clinic, after the reduction of the . . . billing offset to reflect capital and direct medical education costs incurred by the Mayo Clinic.

St. Mary's and Rochester appealed that decision to the Provider Reimbursement Review Board (PRRB), claiming they were owed over $4.1 million in IME reimbursements. The PRRB affirmed the HCFA's decision.[4] It concluded that a 1986 amendment to the 602(k)-waiver provision showed a congressional intent to leave in place the Secretary's interpretation of how the 602(k) waiver affects the IME

[4]It appears that this case was pending before the PRRB for more than ten years. No explanation for the delay appears in the record or the parties' briefs.

reimbursement scheme for the cost reporting periods beginning before January 1, 1986—the effective date of the amendment. Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, § 9112, 100 Stat. 82, 163 (1986).

After exhausting their administrative remedies, St. Mary's and Rochester sought review in the district court. The district court[5] affirmed the PRRB's decision, and so do we.

## II.    DISCUSSION

We review the district court's decision de novo. Shalala v. St. Paul-Ramsey Med. Ctr., 50 F.3d 522, 527 (8th Cir. 1995).

### A.    Congressional Intent

Under Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), the question we must first address, "always, is . . . whether Congress has directly spoken to the precise question at issue." Id. at 842. So we look to the statute's plain language. And if we, "employing traditional tools of statutory construction, ascertain[] that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." Id. at 843 n.9.

St. Mary's and Rochester argue that the decision not to calculate their IME reimbursement from an unreduced DRG payment was contrary to Congress's unambiguously expressed intent. We disagree. We have reviewed the legislative history accompanying the original 1983 version of section 602(k) and the IME-reimbursement provisions. We conclude that neither the statutes' plain language nor

_____

[5]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

any discernible congressional intent on the precise question at issue resolves this case. The hospitals' arguments, however, are premised primarily on the 1986 amendment to the 602(k)-waiver provision. That amendment, among other things, added a new subsection (2) to 602(k):

> In the case of a hospital which is receiving payments pursuant to a waiver under paragraph (1), payment of the adjustment for indirect costs of approved educational activities shall be made as if the hospital were receiving under part A of title XVIII of the Social Security Act all the payments which are made under part B of such title solely by reason of such waiver.

Pub. L. No. 99-272, § 9112, 100 Stat. at 163. The amendment also included effective dates for both the new subsection (2), and the new subsection (3)(a):

> (b) Effective Dates.—(1) Section 602(k)(2) of the Social Security Amendments of 1983 (as added by subsection (a)) shall apply to cost reporting periods beginning on or after January 1, 1986.
> (2) Section 602(k)(3) of the Social Security Amendments of 1983 (as added by subsection (a)) shall apply to items and services furnished after the end of the 10-day period beginning on the date of the enactment of this Act.

Id. In sum, Congress's implemented the very construction of the statutes that the hospitals now champion. But Congress didn't go all the way back to 1984. Instead, it chose to use specific effective dates for the provisions it was adding. And, with regard to subsection (2), Congress chose cost reporting periods that began over four months before the law's enactment on April 7, 1986.

Both the district court and the PRRB hung their hats on the statute's effective date. We agree that the amendment plainly states how 602(k)-waiver offsets affect a hospital's IME reimbursements for cost reporting periods beginning on or after

January 1, 1986. But, as we explain below, that does little to settle the question presented here—whether or not the Secretary could reach a different conclusion for cost reporting periods beginning before January 1, 1986. So we disagree with the district court and the PRRB insofar as they ruled that Congress's 1986 amendment closed the door on the hospitals' claim.

Congress, when it made the 602(k)-waiver amendment in 1986, did not speak to those prior years in the statute. It neither expressly endorsed nor prohibited the Secretary's construction of the statute by spelling out how IME reimbursements should be calculated for the cost reporting periods at issue in this case. See Red Lion Broad. Co. v. FCC, 395 U.S. 367, 380-81 (1969) ("Subsequent *legislation* declaring the intent of an earlier statute is entitled to great weight in statutory construction." (emphasis added)); Consumer Prod. Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 118 n.13 (1980) (distinguishing between subsequent legislation and statements made in hearings and committee reports); Johnson v. United States Dep't of Hous. and Urban Dev., 911 F.2d 1302, 1310 (8th Cir. 1990).

The legislative history to the 1986 amendment is similarly unavailing. The amendment was part of budget-reconciliation legislation that took a storied path in the 99th Congress. The legislation originated in separate bills. In the House of Representatives, H.R. 3128 began with no provision regarding the interaction of IME reimbursements and the section 602(k) waiver. In the Senate, S. 1730 had such a provision, but in a much sparser form than was eventually passed:

> SEC. 710. INDIRECT TEACHING ADJUSTMENT FOR CERTAIN CLINICS.
> In the case of a hospital which is receiving payments under title XVIII of the Social Security Act pursuant to a waiver under section 602(k) of the Social Security Amendments of 1983, payment of the adjustment for indirect costs of approved educational activities shall be made as if such hospital were receiving under part A of such title all the

payments which are made under part B of such titles solely by reason of such waiver.

S. 1730, at 164, reprinted in 131 Cong. Rec. at 27,490.

H.R. 3128 passed the House. The Senate struck the entirety of the House's version, substituted the text of S. 1730, including section 710, and sent the amended bill back to the House. 131 Cong. Rec. at 31,974-75. The House, in turn, struck the entirety of the Senate's amendment to H.R. 3128, and substituted the original text of H.R. 3128. 131 Cong. Rec. at 34,511-12. The bill then went to a joint conference committee. The conference committee reported an amended bill, H.R. Rep. No. 99-453, reprinted in 131 Cong. Rec. at 38,124, along with a joint explanatory statement, 131 Cong. Rec. at 38,234. The conference committee's amended bill included the language of H.R. 3128 that eventually became the 602(k)-waiver amendment at issue here, 131 Cong. Rec. at 38,151-52, and the effective dates appeared for the first time in that amended bill. The explanatory statement is the only indicia we have of why Congress included the effective date in the ultimate legislation.[6]

We need go no deeper into the legislative history to evaluate the parties' arguments. The hospitals argue that the 602(k)-waiver amendment was a "clarifying" amendment, geared at overruling the Secretary's construction of the statute under the rubric of declaring Congress's original intent. The Secretary, on the other hand, argues that the 602(k)-waiver amendment was a "changing" amendment, geared at changing the way in which the statute dealt with IME reimbursement from the effective date on.

---

[6]The House initially rejected the conference's report, but it is still indicative of the legislative intent regarding the 602(k) amendment for our purposes because Congress later passed the suggested amendment to 602(k) as it appeared in the conference committee's amended bill.

The hospitals garner support for their argument from the legislative history accompanying the original Senate bill. The Senate Budget Committee issued a comprehensive report, S. Rep. No. 99-146 (1985), incorporating various other committee's analyses of the legislation. Id. at 19. The Finance Committee's portion of the analysis explained the Senate's proposed amendment to section 602(k):

> *Current law.*—For the first three years of the prospective payment system (PPS), a special exception is applied to hospitals which had traditionally allowed direct billing under Part B so extensively that it would have been disruptive to immediately require them to bill for all such services under Part A. . . . The Health Care Financing Administration has ruled that in such split payment cases, the indirect teaching adjustment would apply only to the portion of the Medicare payment that is paid through Part A.
> *Explanation of provision.*—The provision would clarify that the split payment provisions was [sic] only intended to provide a temporary billing accommodation for certain hospitals and that the indirect teaching adjustment should be applied as if the entire PPS payment had been made under Part A.
> *Effective date.*—Enactment.

Id. at 294, reprinted in 1986 U.S.C.C.A.N. at 42 at 261. The conference report, which included a substantially different version of the 602(k) amendment (the one that eventually passed), included a joint explanatory statement. In that statement, the conference committee recounted the current-law and explanation-of-provision language from the Senate Report and explained the conference's agreement:

> The conference agreement includes the Senate amendment [the language of S. 1730 that was substituted for H.R. 3128's language], with the following modifications. . . . Payment of the indirect teaching adjustment as if all services were billed under the PPS payment methods in part A, will be effective with the first hospital cost reporting period beginning on or after January 1, 1986.

131 Cong. Rec. at 38,259.

From this, all we can glean is that Congress intended the amendment to take effect on January 1, 1986. The hospitals' citation of the word "clarify" from the Senate Report, in conjunction with an expression of what the Senate thought the earlier Congress intended—"was only intended to"—and the report's mention of the HCFA's decision, are somewhat indicative of the Senate's intent to change what the administration had done under the 1983 legislation. And it at least implies that the Senate thought the HCFA had erred in its construction of the statute. But the language that ultimately made it into the statute was derived from the conference committee's amended bill in which the conference included the Senate's proposal with modifications. One of those modifications was the effective date. This indicates that Congress did not want to change the rules that far back. And the statements included in the legislative history to the Senate's bill provide "'a hazardous basis for inferring the intent of an earlier [Congress].'" United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 349 (1963) (quoting United States v. Price, 361 U.S. 304, 313 (1960)); accord Consumer Prod. Safety Comm'n, 447 U.S. at 118 n.13.

Moreover, once we consider the context of the legislation—as part of a budget reconciliation act geared at cutting costs—the hospitals' interpretation of the amendment as being applicable to cost reporting periods starting before January 1, 1986, would surely frustrate the congressional intent evident in 1986. In sum, even if the Senate wanted to "clarify" the statute, Congress appears to have decided that it could not afford to make that adjustment retroactive to 1984.

Taken in this light, we know two things about the 1986 amendment: (1) Two committees were aware of the HCFA's decision regarding IME reimbursement, and (2) Congress clearly enunciated the way in which IME reimbursements were to be calculated for cost reporting periods beginning on or after January 1, 1986. But we do not take the 1986 amendment as far as the district court and the PRRB did; we do not glean from the amendment an indication that Congress acquiesced in or validated the Angellotti decision for the cost reporting periods beginning before January 1,

1986.  See S.E.C. v. Sloane, 436 U.S. 103, 121 (1978) (questioning acquiescence in a case where it was "based only upon a few isolated statements in the thousands of pages of legislative documents").  Congress's intent with regard to how the waiver provision and the IME reimbursement mechanism should interact was unclear in 1983 when it enacted the statutes that govern the cost reporting periods at issue.  And Congress's 1983 intent remained as unclear after the 1986 amendment.[7]

## B.    The Secretary's Interpretation

With the 1983 congressional intent in doubt, and with no clarification of that original intent in the subsequent amendment, we turn to the Secretary's interpretation of the 1983 legislation.  In 1983, Congress did not address the precise issue presented here: whether or not the 602(k) waiver should reduce the hospitals' DRG reimbursement for purposes of calculating the hospitals' IME reimbursements.  So the Secretary was left with little or no statutory guidance.  When such a gap is filled by regulation or formal agency adjudication, we will hold such a construction impermissible only if the agency acted unreasonably.  Chevron, 467 U.S. at 843-44.  The formal adjudication of this matter—the PRRB decision—did not reach the question presented here because it viewed the 1986 amendment as dispositive.  However, the Angellotti letter interpreted the statutes as they applied to the hospitals' reimbursements.  That letter is not entitled to Chevron-type deference because it does not appear to have "the force of law." Christensen v. Harris County, 529 U.S. 576, 587 (2000).  Indeed, the PRRB regarded Mr. Angellotti's letter as "more interpretive

---

[7]Relying on the legislative history to the Senate bill, the hospitals' attempt to call into doubt the phrase "cost reporting period" by arguing that the period should be calculated based on repayment, which is triggered by the Notice of Program Reimbursement (NPR), and apparently delayed a year or two after the actual "cost reporting period." The argument is unpersuasive as we have already explained that the legislative history to the Senate bill is not dispositive of Congressional intent. Furthermore, the statute clearly refers to "cost reporting period" and makes no mention of repayment or the NPR.

in nature than authoritative."  However, the Angellotti letter does represent the HCFA's, and therefore the Secretary's, interpretation of the statute.  Thus it is "'entitled to respect'" to the extent it has the "power to persuade."  Christensen, 529 U.S. at 587 (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944)).  Under that standard, an agency interpretation may stand if it is persuasive.  Kai v. Ross, 336 F.3d 650, 655 (8th Cir. 2003).  We are persuaded by the Secretary's interpretation.

The IME reimbursements in this case were calculated based on the amount of money each hospital received.  The waiver, by the express terms of the statute, reduced the amount of money each hospital received.  Thus, the waiver had the incidental effect of reducing the IME reimbursement.  The 1983 statute does not require or prohibit this effect of the waiver provision, and the legislative history of the 1983 legislation does not reveal a congressional intent that it should or should not occur.  But the incidental reduction to IME reimbursement makes sense.  The IME reimbursement is meant to compensate hospitals for the inherent shortfalls that arise from the DRG payment system.  Because DRG's are calculated on a region-wide basis that includes non-teaching hospitals, teaching hospitals likely would not be adequately compensated because it costs them more to provide the same services as non-teaching hospitals.  But when a portion of the services associated with a patient's care are not provided by the teaching hospital, then it makes little sense to reimburse the non-providing teaching hospital for its inefficiencies.  Because the hospitals did not deliver the services for which the Mayo Clinic was paid, the inefficiencies that arise from the hospitals' teaching activities had no discernable effect on the total cost of the patient's care.  In other words, the hospitals could not have inefficiently delivered services that they did not deliver.  And the hospitals have offered no evidence to the contrary.

Given the statutory provision that requires a reduction in the waiver hospitals' DRG payments by the ancillary providers' reasonable costs, and the statutes' failure to address how that offset should affect IME reimbursements calculated from DRG

-14-

payments, the Secretary had a gap to fill. The Secretary's interpretation of the statute was logical because it fully reimbursed the hospitals for their costs, including whatever inefficiencies may have arisen because of their teaching activities.[8]

### III. CONCLUSION

Accordingly, we affirm.

_____

[8]The hospitals finally make due-process and equal-protection arguments. We reject these claims because neither of them were raised below. The hospitals, in their reply brief, cite their Memorandum in Support of Summary Judgment as raising the issue before the district court. That document has not been included in the appendix, but according to the brief it says, "the Angellotti letter's interpretation results in an arguably unconstitutional distinction among similarly situated hospitals." App. Reply Br. at 18. That statement did not present the issue to the district court. See Larken, Inc. v. Wray, 189 F.3d 729, 735 (8th Cir. 1999). And we see no plain error.